1  JOSEPH M. BREALL (SBN 124329)
   JILL L. DIAMOND (SBN 259824)
2  BREALL & BREALL, LLP
   1550 Bryant Street, Suite 575
3  San Francisco, CA 94103
   Telephone: (415) 345-0545
4  Facsimile: (415) 345-0538
   jmbreall@breallaw.com
5
6  Attorneys for Plaintiffs
   CHINATOWN NEIGHBORHOOD ASSOCIATION
7  and ASIAN AMERICANS FOR POLITICAL ADVANCEMENT

8
                  UNITED STATES DISTRICT COURT
9
                 NORTHERN DISTRICT OF CALIFORNIA
10
                        OAKLAND DIVISION
11

12  CHINATOWN NEIGHBORHOOD              )  CASE NO: C 12-03759 PJH
    ASSOCIATION, a nonprofit corporation, and )
13  ASIAN AMERICANS FOR POLITICAL       )  **PLAINTIFFS' NOTICE OF MOTION**
    ADVANCEMENT, a political action     )  **AND MOTION FOR PRELIMINARY**
14  committee,                          )  **INJUNCTION**
                                        )
15                      Plaintiffs,     )
                                        )
16       vs.                            )
                                        )
17  EDMUND BROWN, Governor of the State of )
    California, KAMALA HARRIS, Attorney  )
18  General of the State of California, and )
    CHARLTON H. BONHAM, Director,        )
19  California Department of Fish and Game, )
                                        )
20                      Defendants.     )
                                        )
21

22       TO DEFENDANTS EDMUND BROWN, GOVERNOR OF THE STATE OF CALIFORNIA,

23  KAMALA HARRIS, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, AND

24  CHARLTON H. BONHAM, DIRECTOR, CALIFORNIA DEPARTMENT OF FISH AND GAME:

25       PLEASE TAKE NOTICE THAT at 9:00 a.m. on October 10, 2012, or as soon thereafter as

26
27  counsel may be heard, in the courtroom of the Honorable Phyllis Hamilton, located at Oakland

28  Courthouse, 1301 Clay Street, Oakland, California, 94612, Plaintiffs will move for an order for a

                                  — 1 —

preliminary injunction pursuant to Fed. R. Civ. P. 65(a) restraining and enjoining you, your agents, servants, employees and attorneys and those in active concert or participation with you from enforcing Sections 2021 and 2021.5 of the California Fish and Game Code which generally make it unlawful to possess, sell, offer for sale, trade, or distribute a shark fin in California.

This motion will be made on the ground that immediate and irreparable injury will result to Plaintiffs unless the activities described above are enjoined pending trial of this action, and will based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities in Support thereof; the Complaint on file herein; the Declaration of Ronald Mar; the Declaration of Dr. Thomas In-sing Leung; the Declaration of Tin Shing Chao; the Declaration of Pius Lee, and attached exhibits; the Declaration of Mike Flynn; the Declaration of Donald Krebbs; the Declaration of John Bateman; the Declaration of John Hett; the Declaration of Mark Twinam, and attached exhibits; the Declaration of Joseph M. Breall, and attached exhibits; the Declaration of Dr. Robert Hueter; the Declaration of Dr. James Sulikowski; the Declaration of Dr. Vidar Wespestad; the Declaration of John F. Whiteside, Jr.; the Declaration of Anna Li; the Declaration of Peter Kwan; the Declaration of Yin Hung Ng; the Declaration of Bill Lee; the Declaration of Willy S.L. Ng;  the Declaration of Chung Ko Fong; the Declaration of Francis Chow; the Declaration of Tony Mak; the Declaration of Xing Xia Guo Kan; and all the other papers, documents, or exhibits on file or to be filed in this action, and the argument to be made at the hearing on the motion.

Dated: August 9, 2012

BREALL & BREALL, LLP

By: _____

Joseph M. Breall
Jill L. Diamond
Attorneys for Plaintiffs
CHINATOWN NEIGHBORHOOD
ASSOCIATION and
ASIAN AMERICANS FOR
POLITICAL ADVANCEMENT

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

1  JOSEPH M. BREALL (SBN 124329)
   JILL L. DIAMOND (SBN 259824)
2  BREALL & BREALL, LLP
   1550 Bryant Street, Suite 575
3  San Francisco, CA 94103
   Telephone: (415) 345-0545
4  Facsimile: (415) 345-0538
   jmbreall@breallaw.com
5
6  Attorneys for Plaintiff
   CHINATOWN NEIGHBORHOOD
7  ASSOCIATION and ASIAN AMERICANS
   FOR POLITICAL ADVANCEMENT
8

9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12                  OAKLAND DIVISION

13  CHINATOWN NEIGHBORHOOD          )  CASE NO: C 12-03759 PJH
    ASSOCIATION, a nonprofit corporation, and )
14  ASIAN AMERICANS FOR POLITICAL   )  **MEMORANDUM OF POINTS AND**
    ADVANCEMENT, a political action )  **AUTHORITIES IN SUPPORT OF**
15  committee,                      )  **PLAINTIFFS' MOTION FOR**
                                    )  **PRELIMINARY INJUNCTION**
16              Plaintiffs,         )
                                    )  Date: October 10, 2012
17      vs.                         )  Time: 9:00 a.m.
                                    )  Courtroom: 3, 3rd Floor
18  EDMUND BROWN, Governor of the State of )
    California, KAMALA HARRIS, Attorney )
19  General of the State of California, )
    CHARLTON H. BONHAM, Director,   )
20  California Department of Fish and Game, )
                                    )
21              Defendants.         )
                                    )

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................................ii

I.   Overview ...........................................................................................................1

II.  Facts ................................................................................................................2

    1.   Significance of Shark Fin Soup in Chinese Culture...................................2

    2.   Federal Law Banning the Practice of Shark Finning...............................3

    3.   AB 376 and AB 853: the California Shark Fin Ban.................................4

        a.   Provisions of the Shark Fin Ban.................................................5

        b.   Discriminatory Promotion of the Shark Fin Ban...........................5

        c.   Environmental Hype and the Effect of the Shark Fin Ban.............6

        d.   The Impact of the Shark Fin Ban on Chinese Culture and Commerce..............11

    4.   Parties to this Action.............................................................................13

    5.   Preceding Complaint.............................................................................13

III. Legal Argument..................................................................................................13

    1.   Injunctive Relief is Available to Prevent Harm to Plaintiffs' Members................13

    2.   Serious Questions on the Merits are Raised in Plaintiffs' Challenge to the Shark Fin Ban.................................................................................14

    3.   Plaintiffs Will Suffer Irreparable Injury If Defendants Are Not Enjoined From Enforcing the Shark Fin Ban.................................................19

    4.   A Balancing of the Equities Tips in Plaintiffs' Favor and an Injunction is in the Public Interest.................................................................20

IV. Conclusion.........................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Alliance for the Wild Rockies v. Cottrell,* 632 F.2d 1127 (9th Cir. 2011) ................................... 14

*Buckheit v. Dennis,* 2012 U.S. Dist. LEXIS 49062 (N.D. Cal. Apr. 6, 2012) ........................... 15

*Collins v. Brewer,* 727 F.Supp.2d 797 (D. Ariz. 2010) ................................................................ 19

*Diaz v. Brewer,* 656 F.3d 1008 (9th Cir. 2011) ........................................................................... 19

*Doran v. Salem Inn, Inc.,* 422 U.S. 922 (1975) ........................................................................... 20

*Enyart v. Nat'l. Conference of Bar Exam'rs, Inc.,* 630 F.3d 1153 (9th Cir. 2011) .................... 21

*Goldie's Bookstore, Inc. v. Superior Ct. of California,* 739 F.2d 466 (9th Cir. 1984) ................................................................................................................................ 19

*Los Angeles Memorial Coliseum Comm'n. v. Nat'l Football League,* 634 F.2d 1197 (9th Cir. 1980) .................................................................................................... 21

*Loving v. Va.,* 388 U.S. 1 (U.S. 1967) ......................................................................................... 15

*Martin v. Int'l Olympic Comm.,* 740 F.2d 670 ............................................................................ 17

*Nat'l Meat Ass'n v. Harris,* 132 S. Ct. 965 (2012) ...................................................................... 18

*Osorio v. Wells Fargo Bank,* 2012 U.S. Dist. LEXIS 72719 (N.D. Cal. May 24, 2012) ..................................................................................................................... 14, 15, 21

*Petereit v. S.B. Thomas, Inc.,* 63 F.3d 1169 (2d Cir. 1995) ........................................................ 20

*Pike v. Bruce Church,* 397 U.S. 137 (U.S. 1970) ....................................................................... 18

*Reese v. Jefferson Sch. Dist. No. 14J,* 208 F.3d 736 (9th Cir. 2000) .......................................... 15

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597 (9th Cir. 1991) ............................................................................................................ 20

*Vietnamese Fishermen's Ass'n v. Knights of Ku Klux Klan,* 543 F. Supp. 198 (S.D. Tex. 1982) ................................................................................................................ 19

*Washington v. Davis,* 426 U.S. 229 (1976) .................................................................................. 15

*Wilson v. Watt,* 703 F.2d 395 (9th Cir. 1983) ............................................................................. 15

*Winter v. N.R.D.C., Inc.,* 555 U.S. 7 (2008) ........................................................................... 3, 14

*Yick Wo v. Hopkins,* 118 U.S. 356 (1886) ............................................................................ 15, 16

### STATUTES

16 U.S.C. §§ 1801-1884 .................................................................................................................. 3

16 U.S.C. § 3372(a)(1) (1982) ........................................................................................................ 4

42 U.S.C. § 1983 ............................................................................................................... 13, 14, 19

C.F.R. § 600.1200-1204 (2002) ..................................................................................................... 3

C.F.R. § 600.1203(a)(1),(3) ........................................................................................................... 3

C.F.R § 600.1203(a)(5) .................................................................................................................. 3

Cal. Fish & Game Code §1002 ........................................................................... 5
Cal. Fish & Game Code § 2021 ......................................................................... 5
Cal. Fish & Game Code § 2021(b) .................................................................... 5
Cal. Fish & Game Code § 2021(c)-(e) .............................................................. 5
Cal. Fish & Game Code § 2021.5 ...................................................................... 5
Cal. Fish & Game Code § 7704(c) ..................................................................... 4
Cal. Fish & Game Code § 7881 ......................................................................... 4
Cal. Fish & Game Code § 12000 ....................................................................... 5

## RULES

Fed. R. Civ. P. § 65(a) ..................................................................................... 13

## OTHER AUTHORITIES

California State Assembly Bill 376 ........................................................... 4, 5, 6, 7, 9
California State Assembly Bill 853 ................................................................. 4, 5
H.R. 5461, 106th Congress, 2d Sess. (2000) ...................................................... 17

## CONSTITUTIONAL PROVISIONS

U.S. Const., art. I, § 8, cl. 3 ......................................................................... 13, 18
U.S. Const., art. VI, cl. 2 .............................................................................. 13, 18
U.S. Const. amend. XIV, § 1 ...................................................................... 13, 15, 18

# I. **OVERVIEW**

On January 1, 2012, legislation took effect in the State of California banning the possession, sale, trade and distribution of shark fins.  Shark fins are used by people of Chinese national origin to make shark fin soup, a dish of significant historical and cultural importance.  Although the new California law purports to curtail the practice of "shark finning," a practice by which a shark's fin is removed and the shark is returned to the ocean, state and federal laws already impose a complete ban on shark finning in the United States to which the new California law adds no further protections.

The new California legislation was also promoted on the false pretense that it would further shark conservation efforts.  However, most shark populations are not endangered or even threatened.  In actuality, the law does nothing to slow any alleged decline of the shark population because it places no additional restrictions on shark fishing.  Instead, what the law does do is target and discriminate against Chinese Californians by mandating that the shark's fin (the part of the shark which is used only by the Chinese) from legally caught sharks be wastefully discarded, while the remaining approximately ninety-five percent of the shark may be legally used for shark oil, shark meat, sharkskin, and other products.

Despite its supporters' assertions, it is clear that the California law does not further the humane treatment of sharks in the United States, nor does the law further shark conservation efforts.  Instead, the law suppresses longstanding traditional Chinese cultural practices involving shark fin soup, cultural practices which were explicitly and intentionally targeted by proponents of the law.  As such, the State of California, via its state officials who enforce the new law, is discriminating against Californians of Chinese national origin in violation of their civil rights and their rights under the United States Constitution.  The law also greatly harms California merchants by placing undue restrictions on interstate commerce in further violation of the Constitution, and is also unconstitutional because it preempts federal regulations pertaining to shark fishing.

Preliminary injunctive relief to restrain the California law is entirely appropriate in this case.

– 1 –

Through this law, California has already trampled on the constitutional rights of Chinese Californians, as well as on the rights of merchants, and will continue to do so absent the grant of a preliminary injunction. In order to prevent future harm, injunctive relief is both warranted and essential, and thus the Court should grant the Motion for Preliminary Injunction.

## II. FACTS

### 1. Significance of Shark Fin Soup in Chinese Culture

The consumption of shark fin soup is an ancient culinary tradition that is unique to Chinese culture. Declaration of Ronald Mar in Support of Plaintiffs' Motion for Preliminary Injunction ("Mar Decl.") ¶3. The tradition of shark fin soup dates back to China's Ming Dynasty circa 1400 A.D. during which time it was served by the Chinese emperor as symbol of respect for his guests. Declaration of Dr. Thomas In-sing Leung in Support of Plaintiffs' Motion for Preliminary Injunction ("Leung Decl.") ¶3; *see also* Mar Decl. ¶4. References to the consumption of shark fins and the significance of shark fin soup can be found in famous historical Chinese texts such as the Compendium of Materia Medica written by the renowned herbalist, Li Shizhen, during the Ming Dynasty era. Mar Decl. ¶4.

Shark fin soup has evolved to become a key traditional dish for Chinese ceremonial banquets, special events, and holiday festivals. Leung Decl. ¶3; *see also* Declaration of Tin Shing Chao in Support of Plaintiffs' Motion for Preliminary Injunction ("Chao Decl.") ¶¶6-7. Shark fin ("chi") is one of "The Big 4" precious foods in Chinese culture, a group which also includes abalone, sea cucumber and fish maw, all of which are symbolic foods served on special occasions. Leung Decl. ¶4; *see also* Mar Decl. ¶6. Shark fin soup is a cultural delicacy of utmost importance at a traditional Chinese wedding banquet. *See* Leung Decl. ¶4-5; Mar Decl. ¶5. It is customary to serve eight dishes at Chinese wedding banquets because the word "eight" in Chinese sounds similar to the word for "good luck" and shark fin soup is amongst these eight traditional dishes. Leung Decl. ¶5. Shark fin soup symbolizes prosperity at wedding banquets and is an offering that indicates honor, generosity and respect for one's

guests. *See* Leung Decl. ¶5-6; Chao Decl. ¶6; Mar Decl. ¶5; *see also* Declaration of Pius Lee in Support of Plaintiffs' Motion for Preliminary Injunction ("Pius Lee Decl.") ¶2.

Additionally, in Chinese culture there is a strong virtue of "sharing your fortune" with others, which is realized through sharing one's good food with relatives and friends.   Leung Decl. ¶6.  Many Chinese elders who immigrated out of their home country to California did so to build a future for their children and serving shark fin soup at their children's or grandchildren's wedding banquet is their way of showing love, generosity and accomplishment.  Leung Decl. ¶6.

Shark fin soup is also served at Chinese holiday and festival banquets.  It is an important dish at family feasts to celebrate the Chinese New Year and is also eaten at banquets during the Mid Autumn Festival and the Winter Festival.  Chao Decl. ¶7.  Furthermore, shark fins have long been regarded in China as a cure-all tonic, an aphrodisiac and a weapon in the battle against aging.  Chao Decl. ¶8.  Given the clear symbolism, tradition, and significance of shark fin soup in Chinese culture, there can be no question of the importance of shark fins to Chinese Californians.

## 2. <u>Federal Law Banning the Practice of Shark Finning</u>

"Shark finning" is a fishing practice by which the fin is removed from a live shark and then the shark is released back into the ocean to die.  Shark finning is widely regarded as an inhumane practice and as such is prohibited by both California state and federal law.  Under federal law, the Magnuson Stevens Act ("MSA") 16 U.S.C. §§ 1801-1884; 50 C.F.R. § 600.1200-1204 (2002) implemented the Shark Finning Prohibition Act of 2000, and was amended by the Shark Conservation Act of 2010, to prohibit the practice of shark finning (subject to certain exceptions), in United States waters and strictly limit the possession and sale of shark fins.  Among other prohibitions, the MSA generally makes it unlawful to "engage in shark finning …" and to "land shark fins without the corresponding carcasses…" § 600.1203(a)(1),(3).  The MSA also makes it unlawful to "possess, purchase, offer to sell, or sell shark fins taken, landed, or possessed in violation of this section …" § 600.1203(a)(5).

---
– 3 –

The federal Lacey Act adds further protections to prevent the distribution of shark fins obtained through any illegal finning practice by making it "unlawful for any person to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife or plant taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the United States …" 16 U.S.C. § 3372(a)(1) (1982). These stringent federal regulations clearly and completely prohibit the inhumane practice of shark finning in the United States while preserving the legal practice of sustainable shark fishing and permitting shark fisherman to utilize and sell all parts of their catch.

Furthermore, the practice of shark finning by California fisherman has also been illegal under California state law since 1996. Pursuant to the California Fish & Game Code § 7704(c), "[e]xcept as permitted by this code or by regulation of the commission, it is unlawful to sell, purchase, deliver for commercial purposes, or possess on any commercial fishing vessel registered pursuant to Section 7881 any shark fin or shark tail or portion thereof that has been removed from the carcass…"

All together, the above regulations serve to completely ban the practice shark finning in the United States and in California. In compliance with both the California and federal regulations, fishermen do not engage in the practice of live shark finning. *See* Declaration of Mike Flynn in Support of Plaintiffs' Motion for Preliminary Injunction ("Flynn Decl.") ¶4; Declaration of Donald Krebs in Support of Plaintiffs' Motion for Preliminary Injunction ("Krebs Decl.") ¶4; Declaration of John Bateman in Support of Plaintiffs' Motion for Preliminary Injunction ("Bateman Decl.") ¶4; Declaration of John Hett in Support of Plaintiffs' Motion for Preliminary Injunction ("Hett Decl.") ¶4; *see also* Declaration of Mark Twinam in Support of Plaintiffs' Motion for Preliminary Injunction ("Twinam Decl.") ¶6.

### 3. AB 376 and AB 853: the California Shark Fin Ban

#### a. Provisions of the Shark Fin Ban

On October 7, 2011, California State Assembly Bills 376 ("AB 376") and 853 were signed into

– 4 –

law and the main provisions took effect on January 1, 2012.  These bills amended the California Fish &

Game Code by adding Sections 2021 and 2021.5.  See Assemb. B. No. 376 (Cal. 2011); Assemb. B. No.

853 (Cal. 2011) (hereinafter the "Shark Fin Ban" or the "Ban").   Section 2021(b) of the California Fish

& Game Code generally makes it "unlawful for any person to possess, sell, offer for sale, trade, or

distribute a shark fin" in California."   Section 2021 enumerates three exceptions to the general

prohibitions which allow shark fin possession by "[a]ny person who holds a license or permit pursuant to

Section 1002 [possession for scientific, education or propagation purposes] consistent with that license

or permit", allow shark fin possession by "any person who holds a license or permit issued by the

department to take or land sharks for recreational or commercial purposes consistent with that permit",

and provide that "[b]efore January 1, 2013, any restaurant may possess, sell, offer for sale, trade, or

distribute a shark fin possessed by that restaurant, as of January 1, 2012, that is prepared for

consumption."  Cal. Fish & Game Code § 2021(c)-(e).

     Section 2021.5 is a temporary exemption that provides that until July 1, 2013, "any person may

possess, sell, offer for trade, or distribute a shark fin possessed by that person, as of January 1, 2012."

Cal. Fish & Game Code § 2021.5(a)(3).  Any person violating the Shark Fin Ban will be guilty of a

misdemeanor and may be punished by up to six months imprisonment and fine of up to $1000.  *See* Cal.

Fish & Game Code § 12000.

### b.  Discriminatory Promotion of the Shark Fin Ban

     The history and promotion of the Shark Fin Ban indicates that the Ban was directed at

suppressing the practices and traditions of Californians of Chinese national origin.  Assemblyman Paul

Fong, one of the two lawmakers who introduced the proposed legislation and the main proponent of the

Ban, made it clear that the Ban was directed at changing a Chinese practice.  When asked about the

implications of the Shark Fin Ban on Chinese culture, Fong replied, "the Chinese culture used to

promote foot binding on women."  Declaration of Joseph M. Breall in Support of Plaintiffs' Motion for

Preliminary Injunction ("Breall Decl.") ¶2.  Similarly, in a press release from Assemblyman Fong's office he is also quoted as stating "[j]ust like it was unhealthy to bind women's feet, this practice needs to end."  Breall Decl. ¶3.  This derogatory comparison between eating shark fin soup and the practice of foot binding, and the related implication that the Chinese must change their cultural practices, is clearly indicative of the discriminatory intent of the Shark Fin Ban.

Moreover, at an official press conference held on May 6, 2011 in which Fong and other Shark Fin Ban proponents discussed the Shark Fin Ban, Peter Knights, the Executive Director of WildAid,[1] said the following:  "It's very difficult to regulate something that's going out on a boat in Indonesia in the middle of the ocean.  It's very easy to regulate if something is happening in Chinatown here.  Very easy to go 'round to restaurants and find out who's having what."  Breall Decl. ¶4.  This statement, showing the intent to target the Chinese and "regulate" Chinese culture, is clear evidence of the pervasive discrimination against Chinese Californians that underlies the Shark Fin Ban.  Another proponent of the Ban, a prominent San Francisco chef, acknowledged at the same press conference that shark fin soup is "deeply rooted in Chinese culture" and then went on to say "some people are going to take a while to crack -- that nut", implying that the Chinese traditional reverence for shark fin soup is a hardheaded tradition that needs to be broken.  Breall Decl. ¶4.

### c.  Environmental Hype and the Effect of the Shark Fin Ban

The Shark Fin Ban was ostensibly passed to prevent the practice of shark finning and further shark conservation.  This purported underlying purpose can be found in the text of AB 376(f) which states, "California is a market for shark fin and this demand helps drive the practice of shark finning.  The market also drives shark declines.  California can help ensure that sharks do not become extinct as

---

[1] WildAid is a nonprofit organization that worked to promote the Shark Fin Ban in California.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

a result of shark finning."[2]   Additionally, a press release issued by Assemblyman Fong's office falsely stated that "AB 376 bans shark finning, a process where the fins and tails are cut from living sharks, and the remainder of the fish, which is often still alive, in thrown back into the ocean." Breall Decl. ¶6. This statement completely mischaracterizes AB 376 which imposes no actual restrictions on the practice of shark finning.  Moreover, Assemblyman Jared Huffman, the co-author of AB 376, also mischaracterized the Shark Fin Ban in his statement that "[r]emoving [sharks] by this senseless act of finning can seriously destabilize the food chain.  To save them from extinction, our bill targets the demand for these shark fins by banning their sale and possession in California." Breall Decl. ¶7. However, what all these statements fail to mention is that shark finning is already <u>completely illegal</u> in the United States pursuant to state and federal law.  Scientific experts agree that, in general, federal regulations such as the MSA provide strong and sufficient protections to sharks in United States waters. *See* Declaration of Dr. Robert Hueter in Support of Plaintiffs' Motion for Preliminary Injunction ("Hueter Decl.") ¶5; Declaration of Dr. James Sulikowski in Support of Plaintiffs' Motion for Preliminary Injunction ("Sulikowski Decl.") ¶5; Declaration of Dr. Vidar Wespestad in Support of Plaintiffs' Motion for Preliminary Injunction ("Wespestad Decl.") ¶6.  It is clear that the Ban was promoted under fear mongering-type false pretenses and has no practical effect on the already outlawed practice of shark finning.

Defendants will claim that the Shark Fin Ban furthers shark protection efforts by halting the import of shark fins from foreign countries that do not have anti-finning regulations.  But if this was the goal of the Ban, the California legislation should have exclusively banned foreign imports of shark fins

---

[2] When signing the Shark Fin Ban into law, Defendant Governor Edmund Brown stated "[t]he practice of cutting fins off of living sharks and dumping them back in the ocean is not only cruel, but it harms our oceans." Breall Decl. ¶5.

from countries without protective laws, instead of imposing a blanket prohibition on all shark fin trade and possession.  Furthermore, many foreign countries do have anti-finning regulations in place to protect sharks.  For example, the European Union (EU) does not allow the landing of fins exceeding five percent of the live weight of the shark catch and a proposal is pending before the EU member states to reduce this figure to zero percent.  Wespestad Decl. ¶7.  Taiwan is another example of a country that made shark finning illegal in 2012.  Wespestad Decl. ¶7.  Moreover, the practice of live shark finning is not the global norm and is grossly overstated in the media.  Wespestad Decl. ¶¶4-5.  In actuality, it is irrational and physically dangerous for fishermen to take fins from live sharks.  Wespestad Decl. ¶4.

Instead of furthering conservation and treatment efforts, the real effect of the recently enacted Shark Fin Ban is to entirely prohibit the possession and sale of shark fins from legally caught sharks, which clearly does nothing to restrict the practice of finning.  Thus, acquiring and using the fins of even humanely fished sharks, which were obtained in accordance with state and federal finning restrictions, is now prohibited in California.  *See* Twinam Decl. ¶7 (no further sales in California of shark fins obtained from sharks fished in government research fishery).  Yet fishing of non-threatened sharks is still completely legal in California, and the trade and possession of all other parts of these sharks is also permitted.  In fact, the use of approximately ninety-five percent of the shark is still legal: people can eat shark steaks, make products from shark oil, and craft goods from sharkskin.  However, the fin of the same lawfully caught sharks must be discarded in order to comply with the Shark Fin Ban.  This discarding of the fin not only does not promote conservation efforts, it has the opposite effect by causing environmental harm through the unnecessary creation of significant amounts of shark fishing waste.  *See* Flynn Decl. ¶5; Krebs Decl. ¶5; Bateman Decl. ¶5; Hett Decl. ¶5; *see also* Sulikowski Decl., ¶6; Wespestad Decl. ¶9.  This is truly ironic, given the fact that a major criticism of shark finning is that it is a wasteful practice, yet the Shark Fin Ban's only effect is to create another wasteful practice by requiring fishermen to throw away the fins from their catch.

Furthermore, despite the assertions of Huffman that the Ban will "save [sharks] from extinction," *see* Breall Decl. ¶5., the Shark Fin Ban does not further shark conservation efforts. As a preliminary matter, the blanket assertion that sharks, as a whole, are in imminent danger of extinction is incorrect and misleading. Sulikowski Decl. ¶2; Hueter Decl., ¶3, Wespestad Decl. ¶8. There are between four hundred and five hundred species of sharks and the populations of the great majority of these species are healthy - no country considers sharks to be globally endangered. *See* Wespestad Decl. ¶8. Only six species of sawfish (sharks) have an Appendix I Convention on International Trade and Endangered Species (CITES) classification, meaning that they cannot be fished or sold in any country. Wespestad Decl. ¶8

As an example debunking the notion that all sharks are threatened, the population of the spiny dogfish, one shark species that can be found on both the North American east and west coasts, has reached abundant levels in the Atlantic. Sulikowski Decl. ¶2; *see also* Declaration of John F. Whiteside, Jr. in Support of Plaintiffs' Motion for Preliminary Injunction ("Whiteside Decl.") ¶6 (population of U.S. Atlantic spiny dogfish has been increasing dramatically over the last several years). Anecdotal evidence even suggests that the abundance of this species may soon have a negative effect on the ecosystem. Sulikowski Decl. ¶2. Another example is the blacktip shark along the U.S. southeast coast, which is a relatively fast-growing species that is currently not overfished. Hueter Decl. ¶4. Thus the vast generalizations about the imminent extinction of sharks that were made to promote the Shark Fin Ban constitute fear-mongering propaganda.[3]

The fact of the matter is that sustainable shark fishing is completely feasible for many shark

---

[3] San Francisco Supervisor David Chui's statement at the AB376 press conference: "I think there has been a suggestion that there is a conflict between Chinese culture and this legislative proposal. I think with *the shark species on the verge of extinction*, there is no conflict." Breall Decl. ¶4.

– 9 –

species, meaning that the blanket assertions to the contrary[4] that underlie the Shark Fin Ban are false. *See* Sulikowski Decl., ¶¶3-4; Hueter Decl. ¶4; Wespestad Decl., ¶3. The Marine Stewardship Counsel ("MSC") has, for example, already certified a sustainable spiny dogfish shark fishery in British Columbia, Canada and a proposal is currently in the final approval stages before the MSC to certify a the U.S. Atlantic Spiny Dogfish fishery as a sustainable fishery. Sulikowski Decl. ¶3; Whiteside Decl. ¶8-9. Moreover, blacktip sharks can also support a properly managed, sustainable commercial and recreational fishery. Hueter Decl. ¶4. Sustainable shark fishing is also practiced in government shark research fisheries in which government observers are onboard the fishing boats. *See* Twinam Decl. ¶5. Clearly, sustainable shark fishing is not only possible, but is currently being implemented by fishermen on both North American coasts.

Furthermore, as noted above, the Ban does not place further restrictions on the actual fishing of sharks, a practice which is already subject to strict federal and state quotas, bag and size limits, and permit requirements. Flynn Decl. ¶¶3, 6; Krebs Decl. ¶¶3, 6; Bateman Decl. ¶¶3, 6; Hett Decl. ¶¶ 3,6; Twinam Decl. ¶4; *see also* Hueter Decl. ¶5; Pius Lee Decl. ¶5. While proponents of the Ban claim that most sharks are killed for their fins and thus shark fishing will be decreased by banning fins, this broad assertion is false. Sharks are fished for multiple markets, the fin market being only one of many. To use the U.S. Atlantic spiny dogfish as an example, the fin and tail trade comprises only three percent of the overall market for this shark. Whiteside Decl. ¶4. Instead the major spiny dogfish trade is in the back meat which is sold to Europeans for fish and chips (twenty-eight percent of the overall market)

---

[4] Assemblyman Fong stated "[t]here are no sustainable shark fisheries that we know of today." Breall Decl. ¶4.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

and in the sale of spiny dogfish as all-natural fertilizer (thirty-nine percent of the overall market). [5]

Whiteside Decl. ¶4.  Therefore, assertions that the effect of the Shark Fin Ban is to decrease fishing of

sharks are unsupported by commercial and scientific realities and by the Ban's actual restrictions.

### d.  The Impact of the Shark Fin Ban on Chinese Culture and Commerce

The Shark Fin Ban has already had and will continue to have a dramatic and immediate

negative impact on people of Chinese national origin in the State of California.  The supply of lawfully

possessed shark fins (fins obtained prior to January 1, 2012) is dwindling rapidly and will imminently

be exhausted, greatly impacting Chinese cultural practices involving shark fin soup.  *See* Declaration of

Anna Li in Support of Plaintiffs' Motion for Preliminary Injunction ("Li Decl.") ¶¶3, 5; Declaration of

Peter Kwan in Support of Plaintiffs' Motion for Preliminary Injunction ("Kwan Decl.") ¶¶3, 5.

Californians of Chinese national origin will experience difficulty in obtaining fins to use to make the

traditional dish of shark fin soup to serve at important events and during festivals, which takes away

their rights to practice their cultural traditions.  *See* Pius Lee Decl. ¶8.  Restaurants catering to Chinese

patrons are also hugely impacted by the Ban in that the dwindling number of fins makes it difficult to

make shark fin soup to serve at customers' weddings and other important cultural events.  *See*

Declaration of Yin Hung Ng in Support of Plaintiffs' Motion for Preliminary Injunction ("Yin Hung Ng

Decl.") ¶¶3-4, 6; Declaration of Chung Ko Fong in Support of Plaintiffs' Motion for Preliminary

Injunction ("Fong Decl.") ¶¶3-4, 6; Declaration of Willie S.L. Ng in Support of Plaintiffs' Motion for

Preliminary Injunction ("Willie S.L. Ng Decl.") ¶¶3-4, 6; Declaration of Bill Lee in Support of

---

[5] This fact is in sharp contrast to the press conference statement by a Shark Fin Ban proponent that

"[t]here are very few sharks where the meat is even edible and there are a few other products like

cartilage and so forth that they are using, but they pale in insignificance compared to the value of shark

fin."  *See* Breall Decl. ¶4.

Plaintiffs' Motion for Preliminary Injunction ("Bill Lee Decl.") ¶¶3-4, 6. As the Shark Fin Ban makes it impossible for anyone to obtain new fins, once the current supply of pre-January 1 2012 fins is depleted, the Ban will entirely eradicate centuries old Chinese cultural practices in California.

The Shark Fin Ban also has had, and will continue to have, a dramatic effect on merchants buying, selling and trading shark fins. The Ban has already cost businesspeople millions of dollars and numerous jobs. Small business owners, such as restaurateurs and owners of Chinese grocery stores, for who shark fin sales are an essential component of their businesses can no longer buy and sell shark fins, which is hugely detrimental to their businesses. *See* Li Decl. ¶¶3-4; Kwan Decl. ¶¶3-4; Yin Hung Ng Decl. ¶¶4-5; Fong Decl. ¶¶4-5; Willie S.L. Ng Decl. ¶¶4-5; Bill Lee Decl. ¶¶4-5.

Furthermore, the Ban has and will continue to have a huge impact on the business of importers, who trade shark fins in interstate commerce. Some importers, engaged in buying shark fins from fishermen in other states and selling them in California, deal almost exclusively in shark fins and have done so for many years. *See* Declaration of Francis Chow in Support of Plaintiffs' Motion for Preliminary Injunction ("Chow Decl.") ¶3 (shark fin importer for fifteen years and shark fin sales constitute approximately ninety-nine percent of business); Declaration of Tony Mak in Support of Plaintiffs' Motion for Preliminary Injunction ("Mak Decl.") ¶3 (shark fin importer for seventeen years and shark fin sales constitute approximately ninety-nine percent of business). As a result of the Ban, these importers will lose their entire livelihoods since they are no longer permitted to engage in any shark fin-related business practices. *See* Chow Decl. ¶¶4-5; Mak Decl. ¶¶4-5. Importers who buy and sell shark fins along with other goods also risk the destruction of large percentages of their sales, which seriously threatens the viability of their businesses. *See* Declaration of Xing Xia Guo Kan (Joyce Kan) in Support of Plaintiffs' Motion for Preliminary Injunction, ¶¶3-6 (shark fin sales constitute approximately fifty percent of business).

///

### 4. **Parties to this Action**

Plaintiff Chinatown Neighborhood Association ("CNA") is a nonprofit corporation and a voluntary association of merchants and Californians of Chinese national origin that is headquartered in San Francisco, California.  CNA's members engage in traditional Chinese cultural practices and buy, sell and trade traditional goods including shark fins.

Plaintiff Asian Americans for Political Advancement ("AAPA") is a political action committee registered in the State of California and headquartered in Burlingame, California.  AAPA's members are people of Chinese national origin who are engaged in cultural practices involving the use of shark fins and in business practices involving the buying and selling of shark fins in interstate commerce.

Defendant Edmund Brown, as Governor of California, Defendant Kamala Harris as Attorney General of California, and Defendant Charlton H. Bonham, as Director of the California Department of Fish and Game, enforce the California Fish and Game Code.

### 5. **Preceding Complaint**

Plaintiffs' Motion for Preliminary Injunction was preceded by Plaintiffs' Complaint for Declaratory and Injunctive Relief ("Complaint") challenging the Shark Fin Ban.  Specifically, in the Complaint, Plaintiffs allege that the Shark Fin Ban violates Section 1 of the Fourteenth Amendment to the U.S. Constitution, violates Article 1, Section 8, Clause 3 of the U.S. Constitution, violates Article VI, Clause 2 of the U.S. Constitution, and violates 42 U.S.C. § 1983.

### III. **LEGAL ARGUMENT**

### 1. **Injunctive Relief is Available to Prevent Harm to Plaintiffs' Members**

Relief in the form of a preliminary injunction is available to federal plaintiffs pursuant to Fed. R. Civ. P. § 65(a).  The standard for granting injunctive relief was recently articulated by this Court as follows:

– 13 –

"An application for preliminary relief requires the plaintiff to establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Osorio v. Wells Fargo Bank*, 2012 U.S. Dist. LEXIS 72719, *2 (N.D. Cal. May 24, 2012) (*citing Winter v. N.R.D.C., Inc.*, 555 U.S. 7, 21-22 (2008)). The "success on the merits" prong of the *Winter* test is a sliding scale analysis when viewed in light of the "balance of the hardships" component.  The standard dictates that, when the other *Winter* factors have been met, "a preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell,* 632 F.2d 1127, 1134-35 (9th Cir. 2011) ("*Cottrell*"); see *also Osorio* at *3.  ("The Ninth Circuit has clarified, however, that courts in this Circuit should still evaluate the likelihood of success on a 'sliding scale' …").

In the present case, Plaintiffs' members are residents of the State of California who clearly have the right to enjoin the enforcement of the Shark Fin Ban to protect their rights under the United States Constitution and pursuant to 42 U.S.C. § 1983.  This is a situation involving discrimination based on national origin against Chinese Americans and an undue burden on interstate commerce.  Enforcement of the Shark Fin Ban by Defendants would violate the rights of Plaintiffs' members and cause irreparable harm in that Plaintiffs' members will be prevented from engaging in important cultural practices and would suffer great harm to their livelihoods.  Thus, a grant of injunctive relief to restrain the Shark Fin Ban is both appropriate and necessary.

2.  **Serious Questions on the Merits are Raised in Plaintiffs' Challenge to the Shark Fin Ban**

In determining whether to grant injunctive relief, this Court must consider whether Plaintiffs raise serious questions on the merits in their challenge to the Shark Fin Ban. *See Cottrell*, 632 F.2d at 1134-35.  A lesser showing of likelihood of success on the merits is required when the balance of

– 14 –

hardships tips sharply towards a plaintiff; in such a case, plaintiff must demonstrate the irreducible minimum of some chance of success. *Wilson v. Watt*, 703 F.2d 395, 399 (9th Cir. 1983). In analyzing the availability of injunctive relief, the Court accepts the allegations in the complaint as true. *Osorio* at *3.

Plaintiffs allege that the Shark Fin Ban clearly discriminates against people of Chinese national origin in violation of Section 1 of the Fourteenth Amendment to the United States Constitution ("Equal Protection Clause"). The Equal Protection Clause provides that states shall not "deny any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV, § 1. "[T]he equal protection of the laws is a pledge of the protection of equal laws." *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). Equal Protection claims of discrimination based on national origin are subject to strict scrutiny by the court, which requires that the challenged discrimination "must be necessary to the accomplishment of some permissible state objective." *Loving v. Va.*, 388 U.S. 1, 11 (U.S. 1967).

"In order to state a claim for violation of the Equal Protection clause of the Fourteenth Amendment, a plaintiff must allege that the individual defendants, acting under color of state law "acted in a discriminatory manner and that the discrimination was intentional." *Buckheit v. Dennis*, 2012 U.S. Dist. LEXIS 49062, *31-32 (N.D. Cal. Apr. 6, 2012) (*citing* Reese v. Jefferson Sch. Dist. No. 14J, 208 F.3d 736, 740 (9th Cir. 2000)). A law that is neutral on its face may still violate the Equal Protection Clause if is shown to have a discriminatory purpose. *Washington v. Davis*, 426 U.S. 229, 241-42 (1976) ("Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another."). A discriminatory purpose is also necessary to a claim of deprivation of rights under the Equal Protection Clause. *Buckheit*, 2012 U.S. Dist. LEXIS 49062 at *32 ("[a] plaintiff must prove two elements before he may be entitled to relief under the Fourteenth Amendment: 1) discriminatory effect; and 2) discriminatory purpose.").

The Shark Fin Ban unquestionably discriminates against Chinese Californians.  The Ban almost solely affects people of Chinese national origin as the Chinese are the only group that utilizes shark fins in cultural practices.[6]  Moreover, as evidenced by the comments made by Assemblyman Fong comparing shark fin soup to foot binding and WildAid's Peter Knights' comment about the ease of regulating Chinatown, lawmakers and key supporters of the Ban have not hidden the fact that, in enacting the Ban, they were attempting to target the Chinese.  Assemblyman Huffman expressed that the intent of the Ban was to "target the demand for these shark fins" which can only mean targeting the Chinese because they are the only people seeking fins.  This is clear evidence of the intent to discriminate against Chinese Americans via the prohibitions of the Shark Fin Ban.

Furthermore, the Ban denies Chinese Californians "the protection of equal laws."  *See Yick Wo*, 118 U.S. at 369.  As articulated by the *Yick Wo* court:

> Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution.

*Id.* at 373-74.  While Defendants may assert that they intended to protect sharks via the Shark Fin Ban, this is a false purpose.  In fact, the Ban does not curtail the fishing of sharks and the use of shark products except to forbid the use of the fin, the only part essential to a uniquely Chinese practice.  As noted above, sharks can still be used for oil, steaks and sharkskin, products which, unlike shark fins, are consumed by multiple cultural groups.  However, the fins of the exact same sharks cannot be used to make Chinese shark fin soup.  Thus, the Ban clearly has the effect of applying the law with an "unequal

---

[6] Most of the buyers and sellers of shark fins whose businesses will be impacted by the Ban are also people of Chinese national origin.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

hand," a practice that is wholly discriminatory and a "denial of equal justice" to Plaintiffs' members and other Chinese Californians.

Moreover, not only does the Ban specifically target the Chinese by place arbitrary restrictions on which parts of a legally fished shark can be used, the Ban is by no means necessary to the accomplishment of a legitimate state objective or a compelling societal interest. *See Martin v. Int'l Olympic Comm.,* 740 F.2d 670, 677 ("When a statute or rule arbitrarily discriminates against any class of persons, it may be justified only if there is a compelling societal interest."). Defendants will argue that the Ban is justified to ensure the ethical treatment of sharks which is a legitimate state objective. But this argument would be disingenuous since the Ban does nothing to further the ethical treatment of sharks. Furthermore, sharks are already fully protected from the inhumane practice of finning under state and federal law, including but not limited to, the MSA and the Lacey Act. Any concern about fins imported from countries that do not prohibit live finning could be properly addressed by restrictions on imports from such countries, not by targeting the Chinese.

Therefore, the Ban is by no means necessary to achieve any purported shark protection objective, nor does it further such an objective since it does not in any way limit shark fishing, either in general or via specific species. To the contrary, the effect of the Ban is to prohibit the use of fins from humanely and legally fished sharks, resulting in the irony that the fin must be discarded while the rest of the shark can be sold and used.[7] Moreover, the Shark Fin Ban also places no additional restrictions on shark fishing, which is already restricted by federal and state quotas and permit requirements, and thus any argument that the Ban is necessary to further shark conservation efforts must also fail. Since the

---

[7] The irony of the Ban is that it creates waste by requiring the disposal of fins when the purpose behind the federal regulations of the MSA is to "eliminate the *wasteful* and unsportsmanlike practice of shark finning" (emphasis added). H.R. 5461, 106th Congress, 2d Sess. (2000).

– 17 –

Ban is both discriminatory against people of Chinese national origin and not necessary to the accomplishment of a legitimate state objective, it cannot withstand a strict scrutiny analysis and Plaintiffs will prevail on the merits of their challenge under the Equal Protection Clause.

In addition, Plaintiffs' challenge to the Ban pursuant to Article I, Section 8, Clause 3 ("Commerce Clause") of the United States Constitution also raises serious questions on the merits and warrants a grant of preliminary injunctive relief.   The Commerce Clause gives Congress the power "[T]o regulate commerce with foreign Nations and among the several states…" U.S. Const., art. I, § 8, cl. 3.  In analyzing whether a state statute violates the Commerce Clause, courts look to whether the "burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church*, 397 U.S. 137, 142 (U.S. 1970).

Finally, the Shark Fin Ban clearly places an excessive burden on interstate commerce in relation to any local benefits.  As previously noted, the Ban places no further restrictions on shark fishing, and state and federal law already prohibit shark finning, thus rendering any potential protections under the Ban duplicative.  Furthermore, while federal law permits trade of humanely obtained fins, the Shark Fin Ban unnecessarily restricts the shark fin trade <u>entirely</u> (while still permitting the trade of other products from the same sharks), and therefore is a blatant excessive restriction on interstate commerce.

Moreover, by essentially rendering federal regulations pertaining to shark fins moot, the Shark Fin Ban usurps and preempts federal law.  This is a violation of Article VI, Clause 2 of the U.S. Constitution (the "Supremacy Clause") which provides that federal law takes precedence over state law when there is a conflict between the two laws.  U.S. Const., art. VI, cl. 2.  In the instant case, there is a conflict between federal law permitting trade of legally obtained shark fins and the Shark Fin Ban which unwarrantedly prohibits such trade.  Federal law must prevail.[8]

---

[8] *Cf.* Nat'l Meat Ass'n v. Harris, 132 S. Ct. 965, 975 (2012).

– 18 –

Finally, Plaintiffs' challenge to the Ban pursuant to 42 U.S.C. § 1983 raises serious questions on the merits, making injunctive relief appropriate.  42 U.S.C. § 1983 imposes liability upon

> [e]very person who under color of any statute … of any State … subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws…

Defendants are officials of the State of California who, under the color of California law, enforce the Shark Fin Ban.  As demonstrated above, the Shark Fin Ban clearly deprives Plaintiffs' members of their rights under the United States Constitution.  Thus, Plaintiffs are likely to prevail on their claim under 42 U.S.C. § 1983.

### 3.  Plaintiffs Will Suffer Irreparable Injury If Defendants Are Not Enjoined From Enforcing the Shark Fin Ban

In determining the appropriateness of preliminary injunctive relief, the Court must evaluate whether a plaintiff will suffer an irreparable injury absent an injunction.  "An alleged constitutional infringement will often alone constitute irreparable harm." *Goldie's Bookstore, Inc. v. Superior Ct. of California*, 739 F.2d 466, 472 (9th Cir. 1984).  "Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm." *Collins v. Brewer*, 727 F.Supp.2d 797, 812 (D. Ariz. 2010) (citation omitted) *affirm'd Diaz v. Brewer*, 656 F.3d 1008 (9th Cir. 2011); *see also Vietnamese Fishermen's Ass'n v. Knights of Ku Klux Klan*, 543 F. Supp. 198, 218 (S.D. Tex. 1982) ("Victims of discrimination suffer irreparable injury regardless of pecuniary damage.").

Plaintiffs' members will experience irreparable harm based on the violation of their Constitutional rights absent a grant of a preliminary injunction.  The denial of Plaintiffs' members' Equal Protection rights, via the suppression of their cultural practices, is a harm that cannot be remedied

by an award of monetary damages.  Because of the Shark Fin Ban, Plaintiffs' members have already been forced to forego the ancient tradition of serving shark fin soup at important events and festivals and will be entirely prevented from engaging in this cultural practice in the future.  Thus, the Court must enjoin the Shark Fin Ban to prevent current and future discrimination against the Chinese and further irreparable harm going forward.

Moreover, although pure economic injury does not constitute irreparable harm, certain business injuries can constitute such harm for purposes of preliminary injunctive relief.  *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).  Preliminary injunctive relief is appropriate if a plaintiff can show "that absent preliminary relief they would suffer a substantial loss of business and perhaps even bankruptcy." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975).  Moreover, major disruption of a business which threatens its viability has been held to constitute irreparable injury since this constitutes damage that is not entirely monetarily compensable.  *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1186 (2d Cir. 1995).

In addition to cultural harms, Plaintiffs' members have suffered, and will continue to suffer, irreparable business harm unless the Shark Fin Ban is enjoined.  Absent a preliminary injunction, merchants whose business is almost entirely built on the buying, selling and trading of shark fins risk complete ruin and loss of their livelihood of many years, and merchants for whom shark fin trade constitutes a major component of their business also face serious risks to their businesses' viability.  Thus, preliminary injunctive relief is necessary to prevent such devastating business losses and losses of livelihood.

4.  **A Balancing of the Equities Tips in Plaintiffs' Favor and an Injunction is in the Public Interest**

In determining whether to grant a preliminary injunction the court has to not only consider the issues discussed above, a plaintiff's probable outcome at trial and the irreparable harm a plaintiff will

– 20 –

suffer, but also consider a balancing of the equities of the situation. *Osorio,* 2012 U.S. Dist. LEXIS at

*2. This analysis requires the Court to "identify the harms which a preliminary injunction might cause

to defendants and to weigh these against plaintiff's threatened injury." *Los Angeles Memorial Coliseum*

*Comm'n. v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980).

Because harm to Plaintiffs' members heavily outweighs any injury to Defendants, the Court's

exercise of its equitable powers is appropriate. Plaintiffs' members will suffer discrimination in the

form of a restriction of their ancient cultural traditions, as well as devastating business effects and a

potential loss of livelihood. Defendants will not suffer any harm by enjoinment of the Shark Fin Ban

because any purported humane treatment issue is addressed under state and federal laws, and the Shark

Fin Ban does not further shark conservation efforts. Thus, while a denial of a preliminary injunction

would do tremendous harm to Plaintiffs' members, Defendants will not suffer actual harm should the

Court grant an injunction. In light of this, an analysis of the balance of the equities heavily tips in favor

of a grant of a preliminary injunction.

Moreover, the public has an irrefutable interest in eliminating discrimination, *see Enyart v.*

*Nat'l. Conference of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011) (affirming grant of

preliminary injunction), and ensuring that their constitutional rights are not infringed upon

unnecessarily by arbitrary and overbroad statutes. While Defendants may argue that the public also has

an interest in shark conservation and protection, as demonstrated above, the Shark Fin Ban does not

further these laudable but imaginary goals. Instead, the Ban actually has a negative impact on the

environment by creating unnecessary fisheries waste from the discarded fins of legally caught sharks,

further supporting the assertion that a preliminary injunction to stop enforcement of the Shark Fin Ban

would be in the public interest.

///

///

– 21 –

1

## IV.  CONCLUSION

2      The Shark Fin Ban has already trampled on Plaintiffs' members Constitutional and civil rights

3  and will continue to deprive members of these fundamental rights unless the Court enjoins the Ban.  In

4  light of the foregoing, Plaintiffs respectfully request that the Court grant their Motion for Preliminary

5  Injunction.

6

7

8  Dated: August 9, 2012                                                      BREALL & BREALL, LLP

9

10                                                                    By: _____

11

12                                                                    Joseph M. Breall
                                                                      Jill Diamond
13                                                                    Attorneys for Plaintiffs
                                                                      CHINATOWN
14                                                                    NEIGHBORHOOD
                                                                      ASSOCIATION and ASIAN
15                                                                    AMERICANS FOR POLITICAL
                                                                      ADVANCEMENT
16

17

18

19

20

21

22

23

24

25

26

27

28