JOHN S. WORDEN (Bar No. 142943)
JWorden@schiffhardin.com
BRUCE A. WAGMAN (Bar No. 159987)
BWagman@schiffhardin.com
SCHIFF HARDIN LLP
One Market, Spear Street Tower, 32nd Floor
San Francisco, California 94105
Telephone:    415-901-8700
Facsimile:    415-901-8701

*Attorneys for Intervenor-Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHINATOWN NEIGHBORHOOD ASSOCIATION, a nonprofit corporation; and ASIAN AMERICANS FOR POLITICAL ADVANCEMENT, a political action committee,<br><br>Plaintiffs,<br><br>v.<br><br>EDMUND BROWN, Governor, State of California; KAMALA HARRIS, Attorney General, State of California; and CHARLTON H. BONHAM, Director, California Department of Fish and Game,<br><br>Defendants,<br><br>THE HUMANE SOCIETY OF THE UNITED STATES; ASIAN PACIFIC AMERICAN OCEAN HARMONY ALLIANCE; and MONTEREY BAY AQUARIUM FOUNDATION,<br><br>Intervenor-Defendants. | Case No. 4:12-cv-03759-PJH<br><br>**INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:        October 10, 2012<br>Time:        9:00 a.m.<br>Ctrm.:       3<br><br>Hon. Phyllis J. Hamilton |

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................... 1

II.     THE PURPOSE OF THE SHARK FIN LAW ......................................................... 2

        A.      Public and Chinese Community Support for the Shark Fin Law ............................. 2

        B.      Conservation, Animal Welfare and Public Health Bases for the
                Shark Fin Law ........................................................................................................ 4

III.    LEGAL ARGUMENT ............................................................................................... 7

        A.      Plaintiffs have No Likelihood of Success on the Merits of Their
                Claims .................................................................................................................... 8

                1.      *Plaintiffs are Not Likely to Succeed on Their Equal
                        Protection Claim* ................................................................................... 8

                2.      *Plaintiffs are Not Likely to Succeed on Their Claim under
                        42 U.S.C. § 1983* ................................................................................. 14

                3.      *Plaintiffs are Not Likely to Succeed on Their Commerce
                        Clause Claim* ....................................................................................... 15

                4.      *Plaintiffs are Not Likely to Succeed on their Preemption
                        Claim* ................................................................................................... 18

        B.      Plaintiffs Have Not Shown Irreparable Harm, and the Balance of
                Any Harms and the Public Interest Favor Denial of the
                Extraordinary Relief Sought ............................................................................... 21

IV.     CONCLUSION ......................................................................................................... 24

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

## <u>CASES</u>

4   *Air Conditioning and Refrigeration Institute v. Energy Resources Conservation and*
      *Development Com'n,*
5     410 F.3d 492 (9th Cir. 2005) ................................................................................ 19

6   *Alliance for Wild Rockies v. Cottrell,*
      632 F.3d 1127 (9th Cir. 2011) ................................................................................ 7

7

    *Amoco Product Co. v. Vill. of Gambell,*
8     480 U.S. 531 (1987) .............................................................................................. 23

9   *Bendorf v. Ojai Basin Groundwater Management Agency,*
      Civ. No. 11-3877-DSF, 2012 WL 3867352 *9 (C.D. Cal. 2012) ........................... 15

10

    *Bibb v. Navajo Freight Lines,*
11    359 U.S. 520 (1959) .............................................................................................. 17

12  *Cavel Intern., Inc. v. Madigan,*
      500 F.3d 551 (7th Cir. 2007) ........................................................................... 12, 18

13

    *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
14    508 U.S. 520 (1993) .............................................................................................. 17

15  *Coalition for Economic Equity v. Wilson,*
      122 F.3d 692 (9th Cir. 1997) ................................................................................. 21

16

    *Cotta v. City and County of San Francisco,*
17    157 Cal. App. 4th 1550 (2007) .............................................................................. 17

18  *Cresenzi Bird Importers, Inc. v. State of New York,*
      658 F. Supp. 1441 (S.D. N.Y. 1987), *aff'd* , 831 F.2d 410 (2d Cir. 1987)................ 18

19

    *De La Cruz v. Tormey,*
20    582 F.2d 45 (9th Cir.1978), *cert. denied*, 441 U.S. 965 (1979) ......................... 14, 15

21  *DeHart v. Town of Austin, Ind.,*
      39 F.3d 718 (7th Cir. 1994) ................................................................................... 20

22

    *Exxon Corp. v. Governor of Maryland,*
23    437 U.S. 117 (1978) .............................................................................................. 16

24  *Fund for Animals v. Norton,*
      374 F. Supp. 2d 91 (D. D.C. 2005)........................................................................ 21

25

    *Healey v. Beer Institute, Inc.,*
26    491 U.S. 324 (1989) .............................................................................................. 16

27  *Hillsborough County, Fla. v. Automated Medical Labs., Inc.,*
      471 U.S. 707 (1985) ............................................................................... 18, 19, 20, 21

28

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- ii -

Case No. 4:12-cv-03759-PJH

1

## TABLE OF AUTHORITIES
### *(continued)*

2

**Page**

3

*Hispanic Taco Vendors of Washington v. City of Pasco,*
 994 F.2d 676 (9th Cir. 1993) ............................................................................ 11, 13

4

*Hughes v. Oklahoma,*
 441 U.S. 322 (1979) ............................................................................................. 12

5

6

*Kootenai Tribe of Idaho v. Veneman,*
 313 F.3d 1094 (9th Cir. 2002) ............................................................................. 23

7

*Lydo Entertainment, Inc. v. City of Las Vegas,*
 745 F.2d 1211 (9th Cir. 1994) ............................................................................. 23

8

9

*Maine v. Taylor,*
 477 U.S. 131 (1986) ............................................................................................. 15

10

*Wal-Mart Stores, Inc. v. Dukes,*
 564 U.S. ---, 131 S.Ct. 2541 (2011) .................................................................... 20

11

12

*Mazurek v. Armstrong,*
 520 U.S. 968 (1997) .......................................................................................... 7, 24

13

*Medtronic, Inc. v. Lohr,*
 518 U.S. 470 (1996) ............................................................................................. 19

14

15

*Monteiro v. Tempe Union High School District,*
 158 F.3d 1022 (9th Cir. 1998) ............................................................................. 14

16

*National Association of Optometrists & Opticians v. Harris,*
 682 F.3d 1144 (9th Cir. 2012) ............................................................................. 16

17

18

*National Meat Association v. Harris,*
 --- U.S. ---, 132 S. Ct. 965 (2012) ....................................................................... 19

19

*NCAA v. Miller,*
 10 F.3d 633 (9th Cir.1993) ................................................................................... 15

20

21

*O'Shea v. Littleton,*
 414 U.S. 488 (1974) ............................................................................................. 22

22

*Oregon Waste Systems, Inc. v. Department of Environmental Quality of Oregon,*
 511 U.S. 93 (1994) ............................................................................................... 15

23

24

*Pacific Nw. Venison Producers v. Smitch,*
 20 F.3d 1008 (9th Cir. 1994) ............................................................................... 12

25

*People v. K. Sakai Co.,*
 128 Cal. Rptr. 536 (Ct. App. 1976) ..................................................................... 12

26

27

*Perez v. Holder,*
 640 F.3d 962 (9th Cir.2011) ................................................................................... 8

28

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- iii -

Case No. 4:12-cv-03759-PJH

## TABLE OF AUTHORITIES
### (continued)

Page

*Phany Poeng v. U.S.,*
  167 F. Supp. 2d 1136 (S.D. Cal. 2001) ................................................................... 22

*ike v. Bruce Church, Inc.,*
  397 U.S. 137 (1970) ................................................................................... 16, 17

*Rosenbaum v. City and County of San Francisco,*
  484 F.3d 1142 (9th Cir. 2007) ................................................................................ 9

*Roth v. United States,*
  354 U.S. 476 (1957) ................................................................................................ 17

*Shamrock Farms Co. v. Veneman,*
  146 F.3d 1177 (9th Cir.1998) .............................................................................. 15

*Southeast Alaska Conserv. Council v. U.S.A.C.O.E,*
  472 F.3d 1097 (9th Cir. 2006) ............................................................................. 23

*Thornton v. City of St. Helens,*
  425 F.3d 1158 (9th Cir. 2005) ....................................................................... 10, 15

*U.S. v. Coleman,*
  24 F.3d 37 (9th Cir. 1994) ....................................................................................... 9

*United Haulers Association, Inc. v. Oneida-Herkimer Solid Waste Management Authority,*
  550 U.S. 330 (2007) ............................................................................................... 15

*Valeria v. Davis,*
  307 F.3d 1036 (9th Cir. 2002) ................................................................................ 8

*Ventura County Christian High School v. City of San Buenaventura,*
  233 F. Supp. 2d 1241 (C.D. Cal. 2002) ............................................................... 23

*Wang v. Chinese Daily News, Inc.,* 623 F.3d 743 (9th Cir. 2010) ............................... 20

*Washington v. Davis,*
  426 U.S. 229 (U.S. 1976) ................................................................................. 8, 14

*Weinberger v. Romero–Barcelo,*
  456 U.S. 305 (1982) ................................................................................................ 8

*Winter v. Natural Resources Defense Council, Inc.,*
  555 U.S. 7 (2008) ................................................................................ 7, 8, 22, 23

*Wyoming v. Oklahoma,*
  502 U.S. 437 (1992) ............................................................................................... 15

*Yick Wo v. Hopkins,*
  118 U.S. 356 (U.S. 1886) ............................................................................... 10, 11

## TABLE OF AUTHORITIES
### *(CONTINUED)*

Page

## STATUTES

16 U.S.C. § 916c ................................................................................................. 20

16 U.S.C. §§1801, *et seq* ................................................................................... 19

16 U.S.C. § 1807(1)(P) ....................................................................................... 20

16 U.S.C. § 5305a ............................................................................................... 20

42 U.S.C. §1983 .................................................................................................. 14

Cal. Penal Code § 598a ....................................................................................... 17

Cal. Penal Code § 653(a) .................................................................................... 20

## RULES AND REGULATIONS

50 C.F.R. § 600.1203(a)(5) ................................................................................ 20

50 C.F.R. § 1201(c) ............................................................................................ 19

1

## I.   **INTRODUCTION**

2    Plaintiffs ask this Court to accept as fact their absurd theory that the lead author, official

3 sponsors, and state legislators who supported passage of California's Shark Fin Law, many of

4 whom are themselves Chinese American Californians, are all "racist fear-monger[ers]."  Plf. PI

5 Br. (Dkt. 9) at 7; Declaration of Pius Lee ("Lee Decl.") at ¶ 5.  Plaintiffs' theories of intentional

6 discrimination by the State of California, animal welfare groups like The Humane Society of the

7 United States, conservation organizations like Monterey Bay Aquarium Foundation, and cultural

8 associations like Asian Pacific American Ocean Harmony Alliance (together "Intervenor

9 Defendants") are offensive and false.  Plaintiffs' patchwork of random factual assertions—e.g., a

10 handful of quotes from news articles and a press conference, examples of two species of sharks

11 that Plaintiffs claim have healthy populations in U.S. waters—do not even remotely support the

12 conclusion that the State and the proponents of the Shark Fin Law acted with the purpose of

13 discriminating against the Chinese community, or with any other intent than to advance the

14 conservation, animal welfare, and public health goals raised in support of the Law, and recorded

15 in the official legislative findings for the Law.

16    As described in detail below, there was broad public support for the Shark Fin Law in

17 California at the time it was introduced, including within the Chinese American community.

18 Numerous Chinese American community leaders, business owners and citizens supported passage

19 of the Law.  Further, the non-discriminatory and legitimate governmental interests articulated in

20 favor of the Shark Fin Law by the California legislature are supported by scientists, economists,

21 and experts in the trade of wildlife and wildlife parts.

22    Ultimately, all of Plaintiffs' legal arguments—tucked away toward the very end of their

23 brief—are principally based on the illogical assertion that because federal and state law already

24 prohibit the act of finning along California's coast, the Shark Fin Law will have no beneficial

25 impact on sharks, and therefore the law must be discriminatory.  However, the Shark Fin Law

26 targets the *market* for shark fin products in California, not just the practice of finning in California

27 waters.  Because this erroneous assertion is the lynchpin of Plaintiffs' case, and because the

28 legislature acted rationally to effectuate legitimate government interests in conservation, animal

welfare, and public health, Plaintiffs have no likelihood of success on their legal claims.

Plaintiffs also have not demonstrated the necessary "clear showing" that they will suffer irreparable harm before a merits decision is issued in this case.  First, Plaintiffs admit that their loss of revenue cannot be a basis for issuance of an injunction, and instead rely on claims of unsubstantiated and speculative "business injuries."  Second, they claim that the suppression of their members' cultural interests warrants issuance of an injunction, but do not address the fact that Intervenor APAOHA's members and other Chinese American citizens have cultural interests embodied by the Shark Fin Law that would be harmed if an injunction were to issue.  Plaintiffs also cursorily dismiss the environmental and animal welfare harms addressed by the Shark Fin Law, despite the fact that courts have routinely noted that such harms are themselves irreparable and of significant public interest.  Finally, and perhaps most significant, Plaintiffs have no valid explanation for why they waited so long to challenge a law that was enacted nearly a year ago.  Plaintiffs provide no support for the extraordinary remedy of a preliminary injunction here.

## II.   THE PURPOSE OF THE SHARK FIN LAW

The California legislature passed Assembly Bills 376 and 853 on September 6, 2011, and Governor Brown signed them into law a month later.  The law became effective on January 1, 2012, making it illegal to possess, sell, offer for sale, trade, or distribute a detached shark fin or shark fin product, with limited exceptions, and is codified at California Fish & Game Code §§ 2021, 2021.5 (hereinafter the "Shark Fin Law" or "the Law").

Governor Brown issued a signing statement on October 7, 2011, in which he stated that the practice of shark finning, through which fins for shark fin products are obtained, "is not only cruel, but it harms the health of our oceans," and the decline in shark populations portends "grave threats to our environment and commercial fishing."  Declaration of Ralph Henry ("Henry Decl."), Exh. A.  The Governor also stated that, in enacting the Shark Fin Law and thereby eliminating California as a market for shark fins and fin derived products, the State was making an effort to "reduce demand" in order to protect shark populations.  *Id.*

### A.   Public and Chinese Community Support for the Shark Fin Law

There was broad public support for the Shark Fin Law.  Independent polling completed

1  shortly before Assembly Bill 376 was introduced determined that 76 % of California voters

2  supported legislation making it illegal to sell or distribute shark fins in California.  Declaration of

3  Judy Ki ("Ki Decl.") at ¶ 13, Exh. B.  Further, the same polling showed that 70 % of California's

4  Chinese American voters supported the Shark Fin Law.  *Id*.; *see also* Declaration of Sue Chen

5  ("Chen Decl.") at ¶ 13.  Many Asian Pacific American organizations, elected officials,

6  community and civil rights leaders, celebrities and other individuals formally supported the law.

7  Ki Decl. at ¶ 14, Exh. C (highlighting a list of official supporters circulated to legislators).

8       One of the two official organizational sponsors of the Shark Fin Law, Intervenor

9  APAOHA, promoted the Law in order to represent the many members of the Asian Pacific

10  American community who support the "[t]housands of years of established Chinese philosophy

11  emphasiz[ing] the importance of preserving harmony between humanity and nature.  *Id*., Exh. A.

12  Further, one of the legislative sponsors of the Law, Chinese-immigrant Assembly-member Paul

13  Fong has indicated that his leadership on this issue is based on his understanding of the Chinese

14  cultural values supported by the Law.  Declaration of Paul Fong ("Fong Decl.") at ¶¶ 3-5.

15       Contrary to Plaintiffs' assertions of extensive suppression of Chinese culture, many

16  Chinese Americans do not consume shark fin products and do not believe that such products are a

17  defining element of Chinese culture.  Ki Decl. at ¶¶ 6-9.[1]  Indeed, polling shows that 38 % of

18  California's Chinese American population has never eaten shark fin soup, and almost half of

19  those individuals have never even heard of it.  *Id*. at ¶ 7.  While California has a significant

20  market for shark fins, many Chinese restaurants in California do not serve shark fin products, and

21  there are virtually no businesses that sell *only* shark fin products.  Declaration of Christopher

22  Chin ("Chin Decl.") at ¶¶ 9, 11; Ki Decl. at ¶ 8; Chen Decl. at ¶ 10.  Further, the vocal support of

23  the Shark Fin Law by several Asian Pacific American civil rights organizations and business

24  organizations is a testament to the fact that the Law is not the exercise in "racist fear-mongering"

25  Plaintiffs claim.  Ki Decl. at ¶ 4, Exh. D (letter from Asian Pacific American civil rights leaders

26

27       [1]  Notably, the Chinese government recently announced a prohibition on serving shark fin
     soup at all state-sponsored banquets.  *See* Henry Decl., Exh. B.

28

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

to Governor Brown); *contra* Lee Decl. at ¶ 5.

**B.**   **Conservation, Animal Welfare and Public Health Bases for the Shark Fin Law**

The Shark Fin Law confirmed, as a matter of state policy, that shark finning is a cruel practice with significant detrimental effects on ocean life and ecosystems.  The legislature made the following official findings:

(a) Sharks, or elasmobranchs, are critical to the health of the ocean ecosystem.

(b) Sharks are particularly susceptible to decline due to overfishing because they are slow to reach reproductive maturity and birth small litters, and cannot rebuild their populations quickly once they are overfished.

(c) Sharks occupy the top of the marine food chain.  Their decline is an urgent problem that upsets the balance of species in ocean ecosystems and negatively affects other fisheries.  It constitutes a serious threat to the ocean ecosystem and biodiversity.

(d) The practice of shark finning, where a shark is caught, its fins cut off, and the carcass dumped back into the water, causes tens of millions of sharks to die each year.  Sharks starve to death, may be slowly eaten by other fish, or drown because most sharks need to keep moving to force water through their gills for oxygen.

(e) Data from federal and international agencies show a decline in shark populations worldwide.

(f) California is a market for shark fin and this demand helps drive the practice of shark finning.  The market also drives shark declines.  By impacting the demand for shark fins, California can help ensure that sharks do not become extinct as a result of shark finning.

(g) Shark fin often contains high amounts of mercury, which has been proven dangerous to consumers' health.

Cal. Stats. 2011, Ch. 524 (A.B. 376) § 1(a)-(g).  These official legislative findings are supported by scientists, economists, and experts in the trade of wildlife and wildlife parts.

There is scientific consensus that sharks are suffering severe population declines around the world.  Declaration of Dr. Stuart Sandin ("Sandin Decl."), at ¶¶ 8-9, Exh. C; Declaration of Dr. Salvador Jorgenson ("Jorgensen Decl."), at ¶¶ 5-7. The International Union for Conservation of Nature ("IUCN"), which is the leading global authority on wildlife population status, lists 107 different species of sharks as critically endangered, endangered, vulnerable, or near threatened—

this includes 56 % of all pelagic (open ocean) sharks.  Sandin Decl., Exh. B (Report of the IUCN Shark Specialist Group).[2]

Each year, the fins from between twenty-six and seventy-three million sharks are used to supply the global demand for shark fins, and this demand fuels shark finning activity.  Henry Decl., Exh. C; Declaration of Rebecca Regnery ("Regnery Decl.") at ¶ 6; Jorgensen Decl. at ¶ 8; Sandin Decl. at ¶ 9.  Contrary to Plaintiffs' assertions, there is substantial evidence that the practice of finning is widespread.  Henry Decl., Exh. C (estimating that the amount of fins involved in the global shark fin trade to be *four times* the amount reported in the U.N. Food and Agriculture Organization's data based on landings alone, and attributing the difference in large part to "a high frequency of shark finning and carcass disposal at sea"); Jorgensen Decl. at ¶ 9 ("Trade and landings data indicate that shark finning is widespread and unmonitored."); Sandin Decl. at ¶¶ 6, 9 ("Sharks are . . . exploited for their fins at alarming rates," and finning "is dangerously efficient because it enables fishing crews to throw out low-value, unwanted and unmarketable shark carcasses and retain only the high-value fins.").

Moreover, a substantial percentage of the fins that actually supply the fin trade come from large sharks that are in severe decline.  Sandin Decl., Exh. C (finding that the fin trade is largely responsible for shark declines, and pelagic sharks account for about one-third of the fins entering the trade); Declaration of David McGuire ("McGuire Decl.") at 8-9; Henry Decl., Exh. D (finding that up to 45 % of the fins auctioned in the Hong Kong market come from 14 shark species listed as threatened with extinction by the IUCN); *id.*, Exh. E (finding DNA from several threatened species in shark fin soup being sold in the United States).[3]  These sharks are particularly

---

[2]  Plaintiffs' reliance on CITES listings of sharks is misplaced.  "CITES listings do not, nor are they designed to, provide an accurate or current snapshot of the biological vulnerability of particular species.  The CITES listing process is highly politicized and often takes years to complete, whereas IUCN monitoring is based solely on the best available science."  Jorgensen Decl. at ¶ 8; *see also* Sandin Decl. at 7 (same).

[3]  That a few shark populations might not be in sharp decline is irrelevant.  When the DNA from fin meat in several bowls of shark fin soup sold in Los Angeles was examined, the results indicated that *all* of fin the meat tested came from vulnerable or near threatened shark species, or from an undeterminable species.  Henry Decl., Exh. E; *see also* McGuire Decl. at ¶ 9 (as recently as 2011, 5,932 kilos of fresh shark fins entered Los Angeles from Costa Rica alone).

1    susceptible to the threats posed by shark finning. Henry Decl., Exh. F (finding that many pelagic

2    sharks have low productivity and high vulnerability to overexploitation, and that three-quarters of

3    the pelagic species caught at sea are listed as "threatened" or "near threatened" by the IUCN).[4]

4         Also contrary to Plaintiffs' assertions, the market for shark fin products worldwide,

5    including the market in California, fuels the practice of finning.  Henry Decl., Exh. H (The IUCN

6    Shark Specialist Group's position statement on shark finning states that "finning takes place

7    because fins are extremely valuable," and that "increased *demand* for shark fins combined with

8    depletion of stock of traditional target species (e.g., tuna and swordfish) transformed sharks from

9    a largely unwanted bycatch into a valuable target species within ten years."); Declaration of Peter

10   Knights ("Knights Decl.") at ¶¶ 8-9; Regnery Decl. at ¶¶ 8-10; McGuire Decl. at ¶ 9.

11        Sharks are highly migratory and thus even though shark finning is banned along the U.S.

12   coastline,[5] finning that occurs on the high seas will still have an effect on sharks and the marine

13   ecosystems dependent on them in coastal waters, including along the California coast.  Henry

14   Decl., Exh. G (describing the vast distances sharks migrate, including between island reef systems

15   and the open ocean); *id.*, Exh. J (many shark species migrate between coastal and oceanic waters).

16   Sharks are critical to the health of ocean ecosystems—they occupy the top of the marine food

17   chain, and their decline is an urgent problem that upsets the balance in ocean ecosystems and

18   constitutes a serious threat to biodiversity.  *Id.*, Exh. G (by controlling mesopredator populations

19   below them, sharks help maintain the health of reef ecosystems); *id.*, Exh. J (loss of large

20   predatory sharks reduces natural mortality in a range of prey, contributing to unnatural changes in

21
22        [4]  Indeed, Plaintiffs' own expert has agreed with these conclusions—Dr. Robert Hueter,
     presenting a lecture on developments in shark research to the American Association for the
     Advancement of Science on March 14, 2012, stated that "the fins of between 26 and 73 million
23   sharks are entering the world's shark fin trade every year.  And the IUCN has estimated that
     about 30 % of Pelagic shark species are threatened with extinction."  Henry Decl., Exh. G.

24        [5]  Throughout their brief, Plaintiffs wrongly insist that sharks are already fully protected from
25   finning under California and federal law, and that this means that the Shark Fin Law will not
     further shark protection at all.  *See*, *e.g.*, Plf. PI Br. (Dkt. 9), at 17-18.  Not only do these laws not
26   prohibit finning worldwide, the mere existence of the laws does not mean they are adequately
     enforced.  *See* Henry Decl., Exh. I (the discovery of fins from 21 great white sharks that came
27   from U.S. shark fisheries, found in the possession of a trader, highlighted the inefficiency of
     finning bans to curb the market for shark fins).

28

1  abundance, distribution, and behavior of many other marine species).

2          In addition to the California legislature's rational and well-substantiated findings as to the

3  conservation benefits of the Shark Fin Law, the legislature's finding that live finning is cruel and

4  inconsistent with the State's interests in protecting animal welfare cannot reasonably be

5  questioned.  As a result of finning, sharks are left unable to swim, and thus cruelly starve to death,

6  are slowly eaten by other fish, or drown.  Sandin Decl. at ¶ 6.  The legislature's findings as to the

7  potential public health benefits are also valid.  As long-lived apex predators, sharks

8  bioaccumulate contaminants such as methylmercury, which has been proven dangerous to

9  consumers' health.  Jorgensen Decl. at ¶ 5; Sandin Decl. at ¶ 4; McGuire Decl. at ¶ 14.  Mercury

10 is a potent neurotoxin that can have deleterious effects on humans, including reduced motor

11 ability and fertility.  *Id.*  As a result, the U.S. Food and Drug Administration and U.S.

12 Environmental Protection Agency have recommended that particularly vulnerable individuals

13 (e.g., children and women of childbearing age) reduce or avoid consumption of shark meat.  *Id.*

14 **III.    LEGAL ARGUMENT**

15         A preliminary injunction is "an extraordinary remedy that may only be awarded upon a

16 clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Resources Defense*

17 *Council, Inc.,* 555 U.S. 7, 22 (2008).  Such relief "should not be granted unless the movant, by a

18 clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong,* 520 U.S. 968, 972

19 (1997) (per curiam) (citation omitted).

20         Plaintiffs seeking a preliminary injunction must establish that they are likely to succeed on

21 the merits, that they are likely to suffer irreparable harm in the absence of such relief, that the

22 balance of equities tips in their favor, and that issuance of the injunction is in the public interest.

23 *Winter*, 555 U.S. at 20.  Alternatively, plaintiffs may demonstrate that "serious questions going to

24 the merits were raised," but in such cases the balance of the equities must "tip sharply" in their

25 favor," and they still must establish a likelihood of irreparable injury and that an injunction is in

26 the public interest.  *Alliance for Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131 (9th Cir. 2011).

27         The Ninth Circuit has made clear that showing "serious questions going to the merits"

28 requires more than establishing that "success is more likely than not;" rather, a "substantial case

1   for relief on the merits" must be demonstrated.  *Leiva–Perez v. Holder,* 640 F.3d 962, 967 (9th

2   Cir.2011).  Further, a preliminary injunction "is not a remedy which issues as of course."

3   *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311 (1982).  A preliminary injunction is always a

4   matter of equitable discretion.  *See Winter*, 555 U.S. at 22.

5        A.    **Plaintiffs have No Likelihood of Success on the Merits of Their Claims**

6            *1.    Plaintiffs are Not Likely to Succeed on Their Equal Protection Claim*

7            The Fourteenth Amendment of the U.S. Constitution guarantees equal protection under

8   the law and prevents "official conduct discriminating on the basis of race."  *Washington v. Davis,*

9   426 U.S. 229, 239 (U.S. 1976). As legislation that is neutral on its face, the Shark Fin Law may

10  only be overturned if there is showing that the law was intentionally designed to "accord disparate

11  treatment on the basis of racial considerations."  *Valeria v. Davis,* 307 F.3d 1036, 1040 (9th Cir.

12  2002) (demonstrable evidence of purposeful racial discrimination is required in equal protection

13  cases).

14           Here, Plaintiffs make the preposterous claim that the legislators, official sponsors,

15  proponents, and members of the public supporting the Shark Fin Law, including many Chinese

16  California citizens, *intentionally* discriminated against the Chinese community in enacting the

17  Law.[6] Plf. PI Br. (Dkt. 9) at 5-6, 15-17.  As clearly established above, the Shark Fin Law was

18  motivated by non-discriminatory and legitimate governmental interests in conserving sharks,

19  promoting animal welfare, and ensuring public health.

20           *a.    There is no Discriminatory Intent behind the Shark Fin Law*

21           The Shark Fin Law does not discriminate on its face, nor do Plaintiffs suggest otherwise.

22  Its text applies equally to anyone, of any race or ethnicity, who would "possess, sell, offer for

23  sale, trade or distribute" a detached shark fin or shark fin product.  Cal. Fish & Game Code

24  §§ 2021.  This includes all persons involved in the shark fin trade, *see* Declaration of Emilio

25  Knox (Knox Decl.) at ¶¶ 3-4 (declaration by former Latin American shark fin trader who

26           [6]  Indeed, the Director of the lead Plaintiff group even makes the libelous claim that everyone
27  who supported the Shark Fin Law, including the Intervenors in this litigation, engaged in "racist
    fear-mongering" in order to pass the bill.  Lee Decl. (Dkt. 9-15) at ¶ 5.

28

1   distributed fins through the State of California),[7] and shark fin products that are unquestionably

2   *not* a part of traditional Chinese culture.  *See* SEAGATE, Product Blog (Shark FIN Cartilage), *at*

3   http://www.seagateproducts.com/shark-fin-cartilage.html (last accessed Sept. 18, 2012) (San

4   Diego company advertising shark fin cartilage for sale "as a high protein dietary supplement used

5   for angiogenesis, or new blood cell formation").

6        To state a valid claim for violation of the Equal Protection clause for a facially neutral

7   law, there must be a showing of a purposeful discriminatory intent in establishing the law.  *U.S. v.*

8   *Coleman,* 24 F.3d 37, 39 (9th Cir. 1994).  The mere knowledge that a piece of legislation may

9   affect a greater proportion of one race rather than another is not enough.  *Id.* (Congress'

10   awareness of disparate consequences on African-Americans of cocaine sentencing act did not

11   establish discriminatory intent).  To show discriminatory intent in an equal protection action, a

12   plaintiff must establish that the decision-maker selected or reaffirmed a particular course of action

13   at least in part *because of*, not merely in spite of, its adverse effects upon an identifiable group.

14   *Rosenbaum v. City and County of San Francisco,* 484 F.3d 1142, 1153 (9th Cir. 2007) (holding

15   that city did not establish or selectively enforce noise ordinance in violation of evangelists' equal

16   protection rights).

17        Plaintiffs present *no evidence* of discriminatory intent behind the Shark Fin Law.[8]

18   Instead, Plaintiffs present two theories that they believe are cause for the Court to *impute* a

19   discriminatory intent here.  First, ignoring the extensive recitation of the non-discriminatory bases

20   for the Shark Fin Law discussed above and in the supporting declarations, Plaintiffs point to a few

21   public statements made by a few proponents of the Law and ask the Court to find, from those

22   statements, evidence that all the legislators who voted for the Law, and all the supporters of the

23

24        [7]  Ironically, Plaintiffs have submitted declarations from a number of individuals who claim to
     be harmed by the Shark Fin Law, but do not allege discrimination on the basis of race, including

25   fishermen and processors.  *See* Declarations of Mssrs. Krebs, Bateman, Whiteside, Hett, Twynam
     and Flynn (Dkt. 9-5, 9-8, 9-9, 9-10, 9-12, 9-13).

26        [8]  Plaintiffs improperly conflate the issues of purposeful discriminatory intent, which is
     subject to strict scrutiny, and disparate impact, which is subject to rational basis review, in their

27   equal protection argument.  The issue of disparate impact is addressed in subsection (b), *infra*.

28

1    Law, had a discriminatory intent – but none can be found.  Plf. PI Br. (Dkt. 9) at 16.  Second,

2    Plaintiffs present the indisputably false assertion that the Shark Fin Law will not actually have

3    any beneficial conservation or animal welfare impact (contradicted by several of Intervenors'

4    declarants), and upon that folly jump to the insupportable notion that therefore the Law must have

5    been motivated by a discriminatory intent.  *Id.* at 17.  Both theories are plainly absurd.

6         Despite Plaintiffs' allegations otherwise, the handful of public statements of individual

7    proponents of the Shark Fin Law cited by the Plaintiffs in their brief are not discriminatory.  *See*

8    *Id.* at 16.  These comments merely indicate an understanding by the speakers that some members

9    of the Chinese American community are consumers of shark fin products, and that all cultures,

10   including the Chinese culture, change over time, and that such changes may be difficult and take

11   time.  *See* Fong Decl. at ¶ 11.  In fact, some of the individuals quoted by the Plaintiffs are

12   themselves Chinese Americans.  Plf. PI Br. (Dkt. 9) at 16.  Lacking evidence of any real or

13   hidden bias, Plaintiffs have tortured the statements to reach their imagined conclusions.  This is

14   insufficient as a matter of law.  *See*, *e.g.*, *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th

15   Cir. 2005) (conclusory statements of bias are insufficient to establish an equal protection or

16   Section 1983 claim based on discrimination).  Moreover, Plaintiffs ignore the multitude of public

17   claims made by proponents of the Shark Fin Law that indicate that the Law was motivated by,

18   and intended to promote, values important to Chinese Americans.  *See*, *e.g*., Declaration of

19   Joseph Breall, Exh. C at 4-5 (proponents discussing how the Shark Fin Law is consistent with

20   Chinese cultural values in the same press conference cited by Plaintiffs); *see also* Ki Decl. at ¶¶ 4,

21   11-13, 15; Chen Decl. at ¶¶ 9-10; Fong Decl. at ¶ 5;

22        Further, *none* of the statements cited by Plaintiffs can be ascribed to the State of

23   California, to the state legislators who voted for the Shark Fin Law, or to any governmental

24   officer charged with enforcing the Law.  Thus, Plaintiffs' reliance on the *Yick Wo* decision in

25   support of their claim of discriminatory intent relating to the public statements they have cited is

26   misplaced.  *See* Plf. PI Br. at 15-16 (citing *Yick Wo v. Hopkins,* 118 U.S. 356 (U.S. 1886)).  In

27   that case, ordinances relating to the operation of laundromats were unconstitutional because they

28   were discriminatorily enforced, by denying consent to operate to persons of Chinese origin but

granting consent to laundromat owners of other national origins.  *Id.*  (distinguishing prior Supreme Court decisions in which ordinances regulating the hours of laundromats, that were applied to all persons engaged in the same business alike, were upheld).  *Yick Wo* stands for the proposition that laws impartial in appearance are still unconstitutional if "applied and administered by the public authority with an evil eye and unequal hand, so as practically to make unjust and illegal discriminations between persons in similar situations."  *Id.*  Plaintiffs have presented no such evidence here, and the Court should reject their twisted effort to attribute random statements in the media into official discriminatory intent

In addition, Plaintiffs' theory that the Shark Fin Law will not have a beneficial impact on the conservation of sharks or animal welfare is illogical.  They argue that the Law "is by no means necessary to achieve any purported shark protection objective," only because the act of finning is already banned in U.S. waters.  Plf. PI Br. (Dkt. 9) at 17.  This argument ignores the fact that the Shark Fin Law is intended to protect and conserve sharks and the marine ecosystems dependent on them by means of regulating local *market* conditions, which laws targeting the practice of finning in domestic waters alone do not address.  Given the legitimate conservation and animal welfare rationale behind the Shark Fin Law, Plaintiffs' theory that the State's action is unexplainable on grounds other than discrimination must fail.

Plaintiffs also entirely ignore the public health rationale behind the Shark Fin Law.  The legislative findings that were enacted into law upon passage of AB 376 specifically state: "Shark fin often contains high amounts of mercury, which has been proven dangerous to consumers' health."  Cal. Stats. 2011, Ch. 524 (A.B. 376) § 1(a)-(g); *see also* Jorgensen Decl. at ¶ 5; Sandin Decl. at ¶ 4; Breall Decl., Exh. C, at 4 (describing a case of mercury poisoning attributed to daily consumption of shark fin soup).  Plaintiffs cannot deny that protecting public health is a legitimate state interest underlying the Shark Fin Law – so they just ignore the issue.

While the Shark Fin Law may affect some Chinese American Californians, it is firmly rooted in case law that a disproportionate impact is not proof of a discriminatory intent.  *Washington v. Davis*, 426 U.S. at 239.  In *Hispanic Taco Vendors of Washington v. City of Pasco*, the plaintiffs argued that an ordinance regulating itinerant vending had such a severe

1    discriminatory impact on Hispanics that they were relieved of their burden of providing evidence

2    of discriminatory intent.  994 F.2d 676, 680 (9th Cir. 1993).  The Ninth Circuit rejected this

3    argument and stated discriminatory motives would not be imputed where there was no evidence

4    that the law was designed to curtail the plaintiffs' vending activities while allowing similar

5    vending activities of vendors of other national origins.  *Id.*  The legislative history of the Shark

6    Fin Law makes clear that the intent of the legislature was to promote conservation of sharks and

7    marine habitats, prevent cruelty to animals, and protect public health—not to discriminate against

8    Chinese Americans.

9                    b.      *The Shark Fin Law is Not Unconstitutional because the Law is
                             Rationally Related to Legitimate Governmental Interests*
10

11          Because plaintiffs can show no discriminatory intent, a strict scrutiny standard of judicial

12   review does not apply.  *Rosenbaum v. City and County of San Francisco,* 484 F.3d at 1157.

13   Where there is no showing of discriminatory intent, the constitutionality of the statute is

14   *presumed* and the law challenged must only "be rationally related to a legitimate state interest."

15   *Hispanic Taco Vendors,* 994 F.2d at 680.  The Shark Fin Law passes that test, given the clear

16   conservation, animal welfare, and public health goals advanced by the Law.

17          Courts have consistently ruled that a state has a legitimate public interest in adopting laws

18   for purposes of wildlife conservation, animal welfare, and public health.  *See*, *e.g*., *Pac. Nw.*

19   *Venison Producers v. Smitch*, 20 F. 3d 1008, 1013 (9th Cir. 1994) ("The protection of wildlife is

20   one of the state's most important interests.") (citing *Hughes v. Oklahoma,* 441 U.S. 322, 337

21   (1979) (state interest in protection of wild animals is similar in importance to interest in

22   protecting health and safety of citizens)); *Cavel Intern., Inc. v. Madigan*, 500 F. 3d 551, 557 (7th

23   Cir. 2007) (Illinois has a legitimate public interest in protecting horses from cruelty, as a basis for

24   state law banning the slaughter of horses for human consumption); *People v. K. Sakai Co.*, 128

25   Cal. Rptr. 536, 539-40 (Ct. App. 1976) (upholding a California law prohibiting the sale of whale

26   meat as a legitimate exercise of state police powers).

27          Plaintiffs weakly argue that the Shark Fin Law would have less of a disparate impact if it

28   banned the sale and/or fishing of all sharks and shark products.  Plf. PI Br. (Dkt. 9) at 7, 17; Lee

1   Decl. at ¶ 7.  But the question for this Court is only whether the Law is discrimination—not what

2   other laws might have been written.  Intervenors have established that it is the high value of the

3   shark fins that fuels the practice of finning and the consequent loss of tens of millions of sharks

4   worldwide each year.  *See*, *e.g.*, Fong Decl. at ¶ 7 (shark fins sell for "up to $600 a pound as

5   opposed to shark meat which receives only a few dollars per pound"); Chen Decl. at ¶ 5 (same);

6   Henry Decl., Exh. K (bill analysis of A.B. 376 by the Assembly Water, Parks and Wildlife

7   Committee, reporting that dried shark fins were found selling for up to $500 per pound, and shark

8   fin soup for up to $500 for 10 people, in California).  As such, it is not surprising that the

9   legislature chose not to prohibit *all* shark fishing, or sale of *all* shark products, since a prohibition

10  on the sale of shark fins is narrowly-tailored to achieve the conservation and welfare goals at

11  issue.[9]  Under a rational basis test, it is irrelevant whether the legislature could have chosen a

12  different means for reaching the same end; the *sole question* is whether the means chosen by the

13  legislature is rational to reach a legitimate government interest.  *Hispanic Taco Vendors,* 994 F.2d

14  at 680.

15       In addition to the legitimate state interests in promoting conservation of sharks and the

16  marine habitats that are dependent upon them, combatting animal cruelty, and ensuring public

17  health, the California legislature acted reasonably in response to overwhelming support for the

18  Shark Fin Law from the Asian Pacific American community.  Independent polling completed

19  shortly before Assembly Bill 376 was introduced showed that 70 % of Chinese American voters

20  in California supported the Shark Fin Law.  Ki Decl. at ¶ 13.  Moreover, many Asian Pacific

21  American organizations, elected officials, community and civil rights leaders, celebrities and

22  other individuals formally supported the law.  *Id*. at ¶ 14, Exh. C, Exh. D.

23       Disparate impact on individuals of one race or ethnicity does not, by itself, make a law

24  unconstitutional under the Equal Protection clause.  *Washington,* 426 U.S. at 239.  There is ample

25
     _____

26   [9]  Opponents of the Shark Fin Ban proposed a ban on all shark fishing as an alternative, *see*
     Henry Decl., Exh. L (bill analysis of A.B. 376 by the Senate Rules Committee, noting opposition
27   arguments in favor of banning all shark meat and products), but such broader prohibition was not
     enacted.
28

evidence that the passage of the Shark Fin Law was based on legitimate and non-discriminatory governmental interests—officially recognized in the legislature's findings—of conservation of sharks and marine habitats, preventing cruelty to animals, and protecting public health.  A number of Asian Pacific American citizens of California actively promoted the Shark Fin Law, and polling indicates that the majority of Chinese Californians support the Shark Fin Law.  The Law is facially-neutral, has no discriminatory intent, and is rationally related to a legitimate government interest.  As such, the Shark Fin Law does not violate the Equal Protection Clause and should be upheld.  *See Hispanic Taco Vendors*, 994 F.2d at 680 (rejecting plaintiffs' equal protection claim where the legislature had provided a neutral explanation, grounded in public policy, for enacting of the ordinance).

> **2.    *Plaintiffs are Not Likely to Succeed on Their Claim under 42 U.S.C. § 1983***

Section 1983 claims based on alleged equal protection violations must plead intentional unlawful discrimination or allege facts that are at least susceptible of an inference of discriminatory intent.  *Monteiro v. Tempe Union High School Dist.*, 158 F.3d 1022, 1026 (9th Cir. 1998) (citing *De La Cruz v. Tormey,* 582 F.2d 45, 58 (9th Cir.1978), *cert. denied,* 441 U.S. 965 (1979) and *Washington v. Davis,* 426 U.S. 229 (1976)).  As discussed in Section (III)(A)(1), *supra*, there is no discriminatory intent behind the Shark Fin Law—the Law is intended to promote legitimate governmental interests in conservation, animal welfare and public health.

Nor have Plaintiffs even adequately pled a Section 1983 claim, which applies only to conduct by a government official that "subjects or causes to be subjected" any citizen to the deprivation of constitutional rights.  42 U.S.C. § 1983.  Plaintiffs allege *no discriminatory conduct* by any government official, e.g. enforcing the law against Chinese Americans and *not* other individuals whose activities are regulated by the Law.  In fact, several of Plaintiffs' declarants are fishermen who claim that the Shark Fin law has already caused them harm based on the fact that they engage in shark fishing and the subsequent sale of fins, *not* because they are Chinese Americans.  *See* Declarations of Mssrs. Krebs, Bateman, Hett, Twynam and Flynn (Dkt. 9-5, 9-8, 9-10, 9-12, 9-13).  A Section 1983 claim does not lie simply because "official action,

1   neutral on its face, . . . results in a racially disproportionate impact." *De La Cruz*, 582 F.2d at 58;

2   *see also Thornton v. City of St. Helens*, 425 F.3d at 1167 (plaintiff's Section 1983 claim failed

3   because there was no evidence of different treatment amongst groups similarly situated); *Bendorf*

4   *v. Ojai Basin Groundwater Management Agency*, Civ. No. 11-3877-DSF, 2012 WL 3867352 *9

5   (C.D. Cal. 2012) ("Although plaintiffs baldly allege that they have been targeted due to veteran

6   and/or gay affiliation, the [first amended complaint] contains no factual allegations to support this

7   allegation.  Plaintiffs do not allege that they are alone in facing enforcement of the Ordinance, but

8   rather allege that others . . . have been targeted.").  Therefore, Plaintiffs have no likelihood of

9   success on their Section 1983 claim.

10                   ***3.        Plaintiffs are Not Likely to Succeed on Their Commerce Clause Claim***

11           The "dormant" Commerce Clause is an implied limitation on states' authority to adopt

12   legislation that discriminates against interstate commerce.  *Wyoming v. Oklahoma*, 502 U.S. 437,

13   454 (1992); *NCAA v. Miller*, 10 F.3d 633, 638 (9th Cir.1993).  In the context of the dormant

14   Commerce Clause "'[d]iscrimination' simply means differential treatment of in-state and out-of-

15   state economic interests that benefits the former and burdens the latter" and that is motivated by

16   "economic protectionism."  *Oregon Waste Sys., Inc. v. Dept. of Envtl. Quality of Oregon*, 511

17   U.S. 93, 99 (1994).  "'[A]lthough a state has power to regulate commercial matters of local

18   concern, a state's regulations violate the Commerce Clause if they are discriminatory in nature or

19   impose an undue burden on interstate commerce."  *See Shamrock Farms Co. v. Veneman*, 146

20   F.3d 1177, 1179 (9th Cir.1998).  However, the restrictions of the dormant Commerce Clause are

21   "by no means absolute" and the "states retain authority under their general police powers to

22   regulate matters of legitimate local concern, even though interstate commerce may be affected."

23   *Maine v. Taylor*, 477 U.S. 131, 137-38 (1986).

24           The Supreme Court has articulated a two-pronged test for resolution of dormant

25   Commerce Clause claims.  First, where a state statute discriminates against out-of-state interests

26   or directly regulates transactions that occur wholly outside of the state's borders, the statute is per

27   se invalid.  *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S.

28   330, 331 (2007).  Second, if the law is not discriminatory and has only indirect effects on

1  interstate commerce, then a court must uphold the law unless "the burden imposed on such

2  commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church,*

3  *Inc.*, 397 U.S. 137, 142 (1970).[10]  "[A] state regulation does not become vulnerable to

4  invalidation under the dormant Commerce Clause merely because it affects interstate commerce."

5  *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012).  Rather,

6  there must "be a *substantial burden* on *interstate commerce*" *and* the burden must be clearly

7  excessive in relation to the local benefits.  *Id.* (emphasis in original).

8          Plaintiffs argue that the Shark Fin Law "unnecessarily restricts the shark fin trade

9  *entirely*."  Plf. PI Brief (Dkt. 9) at 18 (emphasis in original).  But this allegation does not state a

10  claim for relief under the Commerce Clause.  A state law that "simply effectuates a complete ban

11  on commerce in certain items is not discriminatory, as long as the ban on commerce does not

12  make distinctions based on the origin of the items."  *Pac. Nw. Venison Producers*, 20 F.3d at

13  1011 (9th Cir. 1994).  Moreover, the interstate (and in-state) sales of some of Plaintiffs' members

14  may be affected by the Shark Fin Law, but the dormant Commerce Clause "protects the interstate

15  market, not particular interstate firms, from prohibitive or burdensome regulations."  *Exxon Corp.*

16  *v. Governor of Maryland*, 437 U.S. 117, 127-28 (1978); *see also Harris*, 682 F.3d at 1154

17  ("[T]here is not a significant burden on interstate commerce merely because a non-discriminatory

18  regulation precludes a preferred, more profitable method of operating in a retail market.").

19          Plaintiffs' only other argument appears to be a regurgitation of the preposterous claim that

20  the Shark Fin Law has no benefit at all, because, according to Plaintiffs, state and federal laws

21  prohibiting shark finning render the Shark Fin Law "duplicative."  Plf. PI Br. (Dkt. 9) at 18.

22  _____

[10]  Plaintiffs' do not claim that the Shark Fin Law is per se invalid under the first prong of the
dormant Commerce Clause analysis.  *See* Plf. PI Br. (Dkt. 9) at 18; Complt. (Dkt. 1) at ¶¶ 36-45.
Nor could they do so—the Shark Fin Law is not motivated by economic protectionism and does
not discriminate against out-of-state interests.  The Law's prohibitions and exceptions apply even-
handedly to both in-state and out-of-state entities, and the Shark Fin Law does not regulate
transactions occurring wholly outside of California.  The Law is silent as to what in-state or out-
of-state producers may do or sell in states other than California.  *See* Cal. Fish & Game Code
§§2021, 2021.5 (all prohibitions of the Shark Fin Law apply to "any person"); *contra, Healey v.
Beer Institute, Inc.*, 491 U.S. 324 (1989) (striking Connecticut law placing limitations on prices
out-of-state beer distributors—and only out-of-state distributors—could charge in the states
*surrounding* Connecticut).

1   Ostensibly, Plaintiffs believe that this means that *any* effect on interstate commerce must be

2   "clearly excessive" in violation of the Commerce Clause.  However, as already discussed, the

3   Shark Fin Law targets the market for shark fins and shark fin products in California, which is

4   supplied by fins taken from sharks all over the world, not just within U.S. coastal waters.

5   Therefore, the Shark Fin Law is not duplicative and Plaintiffs' argument fails.

6          While the Shark Fin Law will have an indirect effect on interstate commerce, it is not

7   "clearly excessive in relation to the putative local benefits."  *Pike*, 397 U.S. at 142.  It is well-

8   settled that laws promulgated pursuant to a state's interest in the preservation of wildlife "carry a

9   strong presumption of validity."  *Pac. Nw. Venison Producers*, 20 F.3d 1008 at 1014 (citing *Bibb

10  v. Navajo Freight Lines,* 359 U.S. 520 (1959)); *see also K. Sakai Co.*, 128 Cal. Rptr. at 539-40

11  (California ban on sale of whale meat products upheld where it promoted the continued existence

12  of endangered animals; the court having found that "[t]he ban on the sale of all whale products,

13  including those imported prior to the effective date of the legislation, at least decreases the market

14  therefor").

15         It is also well-settled that a state has a "legitimate governmental interest in . . . preventing

16  cruelty to animals."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 538

17  (1993).  Enacting laws that codify and enforce moral values is a function inherent to state

18  governments, which "bear direct responsibility for the protection of the local moral fabric."  *Roth

19  v. United States*, 354 U.S. 476, 503-04 (1957); *see also Cotta v. City and County of San

20  Francisco*, 157 Cal. App. 4th 1550, 1557 (2007) (California legislature has authority to pass laws

21  "in furtherance of public peace, safety, morals, health and welfare.").

22         California has a long history of excluding from the local marketplace animal products that

23  violate the State's ethical norms.  Examples of such products include dog and cat pelts (CAL.

24  PENAL CODE § 598a), the meat of any animal commonly kept as a household pet (*id.* at § 598b),

25  horsemeat (*id.* at § 598d), and exotic and endangered animals or their body parts (*id.* at § 653o).

26  Banning sales of products created by cutting off parts of live animals, and then throwing the

27  animals in the water to drown, bleed to death, or be eaten alive, is perfectly consistent with the

28  state's authority to protect moral values.

Plaintiffs appear to argue that the State does not have a legitimate interest in regulating its local markets in order to promote conservation of, and prevent cruelty to, sharks located outside California.  Plf. PI Br. (Dkt. 9) at 7 (arguing that if "halting the import of shark fins from foreign countries that do not have anti-finning regulations . . . was the goal of the Ban, the California legislation should have exclusively banned foreign imports").  According to Plaintiffs, if in-state shark finning is banned (i.e. along the California coastline), then the State's interest is fully addressed.  Plaintiffs' argument fails as a matter of fact.  As noted previously, fin products in California contain fins from all over the world, not just places like the California coast in which finning is prohibited.  Knights Decl. at ¶ 9; Regnery Decl. at ¶¶ 9-10; McGuire Decl. at ¶ 5.  Further, finning outside U.S. waters can have impacts on sharks and marine ecosystems within U.S. waters and along California's coast.  Sandin Decl. at ¶ 3; Jorgensen Decl. at ¶ 4; McGuire Decl. at ¶ 6.  Plaintiffs' argument also fails as a matter of law for two reasons.  First, prohibiting the sale of a product commonly produced through an inhumane process is a reasonable means of enforcing a state's local interest in preventing animal cruelty.  *See Cavel Intern. Inc.,* 500 F. 3d at 557 ("[Illinois] is permitted to balance its interest in horses' welfare against the other interests of its (human) population; and it is also permitted to take one step at a time on a road toward the humane treatment of our fellow animals.").  Second, the people of a state have the right to determine whether a product sold within its borders is moral or immoral.  *See Cresenzi Bird Importers, Inc. v. State of New York*, 658 F. Supp. 1441, 1447 (S.D. N.Y. 1987), *aff'd* 831 F.2d 410 (2d Cir. 1987) ("New York has a legitimate interest in regulating its local market conditions which lead, in a short causal chain, to the unjustifiable and senseless suffering and death of thousands of captured wild birds. . . .  *The State has an interest in cleansing its markets of commerce which the Legislature finds to be unethical*.") (emphasis added).

### 4.       Plaintiffs are Not Likely to Succeed on their Preemption Claim

Plaintiffs also have no likelihood of success on their preemption claim.  The Supremacy Clause of the U.S. Constitution invalidates state laws that "interfere with, or are contrary to," federal law.  *Hillsborough County, Fla. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 712 (1985).  Federal law can preempt state law in three ways. First, Congress may expressly preempt state law

1   ("express preemption").  Second, preemption may be inferred where Congress has chosen to

2   exclusively occupy a given field with comprehensive regulation ("field preemption").  Third, a

3   state law is preempted to the extent that it actually conflicts with federal law ("conflict

4   preemption").  *Id.*  Courts "address claims of preemption with the starting presumption that

5   Congress did not intend to supplant state law." *Air Conditioning and Refrigeration Institute v.*

6   *Energy Resources Conservation and Development Com'n*, 410 F.3d 492, 496 (9th Cir. 2005)

7   (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996).

8        Plaintiffs make no argument that express or field preemption applies here.  S*ee* Plf. PI Br.

9   (Dkt. 9) at 18 (referring only to a purported "conflict" between federal and state law); *see also*

10  Plf. Complt. (Dkt. 1) at 46-50.[11]  Nor could they do so, given that the federal regulatory scheme at

11  issue, the Magnuson-Stevens Act ("MSA"), 16 U.S.C. §§ 1801, *et seq.*, and its implementing

12  regulations, *expressly permit* more restrictive state regulation relating to shark finning, indicating

13  that that the federal government did not intend its laws relating to shark finning to be exclusive.

14  *Id.* § 1856(a)(1); 50 C.F.R. § 1201(c).  The Shark Fin Law, which regulates the market for shark

15  fin products, does not address the same "shark finning" behavior as that regulated by the federal

16  law.  Even if it did, California would absolutely be permitted to adopt regulations that are more

17  restrictive than the federal regulatory scheme.  Indeed, if California's existing ban on the practice

18  of finning, Cal. Fish & Game Code § 7704(c), which Plaintiffs routinely reference in their brief,

19  is not preempted by the federal law banning the practice of finning, the Shark Fin Law, which

20  regulates wholly distinct activity, most certainly is not either.  Plaintiffs' preemption claim is thus

21  based entirely on the argument that conflict preemption applies here.

22       Conflict preemption arises when "compliance with both federal and state regulations is a

23  physical impossibility." *Hillsborough County*, 471 U.S. at 712.  Plaintiffs' claim that "there is a

24  conflict between federal law permitting trade of legally obtained shark fins" and the Shark Fin

25  Law.  Plf. PI Br. (Dkt. 9) at 18.  However, the provisions of the MSA, relating to shark finning

26
27
    [11] Oddly, however, the only case cited by the Plaintiffs in their preemption argument is *Nat'l Meat Ass'n v. Harris*, --- U.S. ---, 132 S. Ct. 965 (2012), which is an *express* preemption case concerning the scope of the preemption clause found in the Federal Meat Inspection Act.

28

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

*only address the act of finning on the water*, not the market for fin products.  The MSA regulates the taking and possession of shark fins (and only within U.S. waters) up to the point of "*landing*," prohibiting the landing of any shark fin "that is not naturally attached to the corresponding carcass."  16 U.S.C. § 1807(1)(P).  The fact that federal law requires shark fins to be naturally attached until the shark carcass is brought to shore does not also mean that the law *requires* that the sale of detached fins and shark fin products be allowed.[12]  *See DeHart v. Town of Austin, Ind.*, 39 F. 3d 718, 722 (7th Cir. 1994) (dismissing argument that state law permitting localities enact laws providing for humane handling, treatment and care of exotic animals amounts to a prohibition against local laws wholly banning the possession of exotic animals.) The MSA provisions concerning shark finning do not expressly authorize the post-landing possession and sale of detached shark fins, and do not address the possession and sale of shark fin products at all.  Thus, the Shark Fin Law does not create any "obstacle" to implementation of the federal law relating to shark fins, and Plaintiffs' conflict preemption claim must fail. *Hillsborough County*, 471 U.S. at 712 (conflict preemption not warranted where state law does not stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress").

_____

[12]  In fact, the MSA's implementing regulations actually make it *unlawful* to "possess, purchase, offer to sell, or sell shark fins taken, landed, or possessed in violation of this section. . . ."  50 C.F.R. § 600.1203(a)(5).  Of course, this provision does not apply to fins taken from sharks outside of U.S. waters.  Nevertheless, even with respect to fins taken from sharks within U.S. waters, state regulation that is merely duplicative of federal regulation cannot be overturned under a conflict preemption analysis, as implementation of such a state law does not impede implementation of the federal law.  *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 760 (9th Cir. 2010), *abrogated on different grounds by Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. ---, 131 S.Ct. 2541 (2011) (rejecting a conflict preemption claim on grounds that, "[w]here, as here, the state and federal requirements are the same, it is obviously possible to comply with both laws simultaneously").  There are many examples of state laws that overlap or duplicate federal laws. *See* Cal. Penal Code 653(a) (California law prohibiting the sale of the parts of certain animals, including whales and tigers); 16 U.S.C. 916c (federal law prohibiting the sale of most whale products); 16 U.S.C. 5305a (federal law prohibiting the sale for human consumption of tiger parts).  Such coexisting laws allow states to supplement federal efforts to regulate activity that the federal government has not assumed exclusive jurisdiction over (i.e., through express or field preemption).  As noted above, the existing California law prohibiting finning overlaps with the federal law at issue here, but that does not mean the former is preempted by the latter.

1

**B.**     **Plaintiffs Have Not Shown Irreparable Harm, and the Balance of Any Harms**
            **and the Public Interest Favor Denial of the Extraordinary Relief Sought**

2

3          Because all four elements of the test for a preliminary injunction must be met, if a party

4   has not shown a likelihood of success on the merits, a preliminary injunction should not issue.

5   *See Coalition for Economic Equity v. Wilson*, 122 F.3d 692, 710 (9th Cir. 1997) ("With no

6   likelihood of success on the merits of their equal protection or pre-emption claims, plaintiffs are

7   not entitled to a preliminary injunction."); *see also Fund for Animals v. Norton*, 374 F.Supp.2d

8   91, 103-05 (D. D.C. 2005) (denying motion for preliminary injunction upon finding that "while

9   plaintiffs have made a compelling showing of irreparable harm, the defendants' likelihood of

10  success on the merits is so significant that it outweighs the other factors"). As described *supra*,

11  Plaintiffs have not established any likelihood of success on the merits of their claims, and thus the

12  Court should deny the request for a preliminary injunction.

13         Further, the Supreme Court has made clear that even if a likelihood of success on the

14  merits has been shown, a plaintiff must make a showing that harm is *likely to occur* pending a

15  decision on the merits, and that such harm is *irreparable*.  *Winter*, 555 U.S. at 22 (vacating a

16  preliminary injunction that was issued based upon the "possibility" of harm, and where such harm

17  did not rise to the level of being "irreparable").  In the instant case, Plaintiffs, whose members

18  include restaurants, grocery businesses, and shark fin importers, claim loss of revenues and

19  disruption of business operations.  *See* Plf. PI Br. (Dkt. 9) at 11-12.  However, Plaintiffs admit

20  that loss of revenue alone is not a basis for issuance of an injunction in this case.  Plf. PI Br. (Dkt.

21  9) at 20 ("pure economic injury does not constitute irreparable harm").

22         Because their loss of revenue does not constitute irreparable harm, Plaintiffs claim that

23  they have non-economic "business injuries," based on which they assert that the Court should

24  grant a preliminary injunction.  *See* Plf. PI Br. (Dkt. 9) at 12.  However, while Plaintiffs cite case

25  law indicating that bankruptcy and complete loss of one's business can constitute irreparable

26  injury, they cite *no evidence* of any business-related injury other than loss of revenue in their

27  brief.  *See id.* at 11-12, 20.  In fact, only two of Plaintiffs' member-declarants claim anything

28  more than loss of revenue in their declarations—parroting the exact same unsubstantiated

1   statement that "I will ultimately lose my livelihood entirely," Declaration of Francis Chow (Dkt.

2   9-6) at ¶ 4; Declaration of Tony Siu Nam Mak (Dkt. 9-20) at ¶ 4,[13] but these bald conclusions are

3   not supported by any evidence, and do not indicate that this alleged business injury is likely to

4   occur during the pendency of this litigation.  *Winter* 555 U.S. at 22 (quoting *O'Shea v. Littleton,*

5   414 U.S. 488, 502 (1974) ("[A] preliminary injunction will not be issued simply to prevent the

6   possibility of some remote future injury"); *see also Phany Poeng v. U.S.*, 167 F. Supp. 2d 1136,

7   1143 (S.D. Cal. 2001) (denying preliminary injunction where plaintiff failed to provide any

8   "objective and reasonable documentary evidence" that his business would suffer a fifty percent

9   loss).

10       Plaintiffs also urge the Court to find that "the suppression of their cultural practices" is

11   irreparable injury, upon which a preliminary injunction should be based.  *See* Plf. PI Br. (Dkt. 9)

12   at 19-20.  However, even if the inability to consume shark fins during the pendency of this

13   litigation constitutes irreparable harm to the cultural interests of Plaintiffs' members, the issuance

14   of a preliminary injunction would similarly harm Intervenor APAOHA and its members' cultural

15   interests that are supported by implementation of the Shark Fin Law.  Ki Decl. at ¶¶ 3-4.  If

16   suppression of cultural values constitutes irreparable harm for purposes of the preliminary

17   injunction analysis, an injunction should not issue where delayed implementation of a duly

18   enacted law would suppress the cultural interests of proponents of the law.

19       Moreover, the Shark Fin Law was enacted for the purpose of immediately reducing the

20   impact to sharks of cruel and deleterious practices that are fueled by the market for shark fins and

21   shark fin products in California.  *See* Cal. Stats. 2011, Ch. 524 (A.B. 376) § 1(a)-(f) (findings of

22   the legislature, enacted into law, include that "decline [of sharks] is an urgent problem," and the

23   "practice of shark finning . . . causes tens of millions of sharks to die each year").  Here again,

24   Plaintiffs argument that there is no harm to Intervenors, or to the public, in enjoining

---

[13]  All of Plaintiffs' other member-declarants, who operate restaurants and grocery businesses, claim only loss of revenue (and some only claim *anticipated* loss of revenue), not any non-economic business injuries.  *See* Declarations of Mmes. and Messrs. Li, Lee, Fong, Kwan, Ng, Kan and Ng (Dkt. 9-2, 9-3, 9-4, 9-14, 9-22, 9-23, 9-24).

1    implementation of the Shark Fin Law is based on the illogical theory that there is no possible

2    conservation or animal welfare benefit to the Shark Fin Law, because the practice of shark

3    finning is prohibited in U.S. waters.  As described in detail, *supra*, this theory simply does not

4    hold water – the Shark Fin Law does not seek to regulate the same behavior as laws banning the

5    practice of finning.  Thus, Plaintiffs are also incorrect in their assertion that the issuance of an

6    injunction poses no threat of harm to Intervenors, the public, or sharks and the marine

7    environments that are dependent on them.  *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S.

8    531, 545 (1987) (environmental injury is "permanent or at least of long duration" and is itself

9    often irreparable); *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1125 (9th Cir. 2002)

10   ("public's interest in preserving precious, unreplenishable resources must be taken into account in

11   balancing the hardships"); *Southeast Alaska Conserv. Council v. U.S.A.C.O.E*, 472 F.3d 1097,

12   1101 (9th Cir. 2006) ("the public interest strongly favors preventing environmental harm").

13           Finally, a preliminary injunction is an "extraordinary remedy" that is "never granted as of

14   right." *Winter*, 555 U.S. at 24.  The Shark Fin Law was enacted on October 7, 2011, and became

15   effective on January 1, 2012.  Another group of Chinese American business owners in California

16   filed a lawsuit challenging the constitutionality of the Shark Fin Law in January 2012.  *See Asian*

17   *Am. Rights Comm. v. Brown et al.*, No. 12-517723 (Cal. Sup. Ct., San Francisco County).

18   Meanwhile, Plaintiffs' members claim that they have been selling out of their existing stocks of

19   shark fins and experiencing loss of revenue, and they claim that they have been experiencing non-

20   economic cultural injuries as well.  Plf. PI Br. (Dkt. 9) at 20.  "A delay in seeking [injunctive

21   relief] is a factor to be considered in weighing the propriety of relief." *Lydo Enter., Inc. v. City of*

22   *Las Vegas*, 745 F.2d 1211, 1213-14 (9th Cir. 1994); *see also Ventura County Christian High Sch.*

23   *v. City of San Buenaventura*, 233 F. Supp. 2d 1241, 1253 (C.D. Cal. 2002) (where plaintiffs

24   allege "peril [that] is due in part to their own failure to obtain a judicial determination of their

25   rights and obligations at some earlier point in time[,] . . . the public interest should receive greater

26   weight").  It is unclear why Plaintiffs waited nine months to file their lawsuit.  But it is

27   undeniable that whatever harm Plaintiffs claim they or their members will experience while this

28

1   case is litigated was already occurring prior to the commencement of this action, and could have

2   been mitigated or eliminated if they had filed sooner.

3   **IV.**   **CONCLUSION**

4          A preliminary injunction is an "*extraordinary and drastic remedy*, one that should not be

5   granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v.*

6   *Armstrong*, 520 U.S. 968, 972 (1997) (emphasis added). Here, Plaintiffs have established no

7   likelihood of success on the merits of their claims at this time, and have not carried their burden

8   in showing that the Shark Fin Law, which went into effect over nine months ago should be

9   enjoined pending a decision on the merits. For the foregoing reasons, Plaintiffs' request for

10   extraordinary relief should be denied.

11

12   Dated:  September 19, 2012                    SCHIFF HARDIN LLP

13

14                                                By:  */s/ Bruce A. Wagman*

15                                                     John S. Worden
                                                      Bruce A. Wagman
16                                                     *Attorneys for Intervenor-Defendants*

17   SF\320388082.1

18

19

20

21

22

23

24

25

26

27

28