UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHINATOWN NEIGHBORHOOD ASSOCIATION, et al., | Case No. 12-cv-03759-WHO |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTIONS TO DISMISS** |
| KAMALA HARRIS, et al., | Re:  Dkt. Nos. 58, 59 |
| Defendants. | |

The State of California has made it "unlawful for any person to possess, sell, offer for sale, trade, or distribute a shark fin."  CAL. FISH & GAME CODE §§ 2021 and 2021.5 (the "Shark Fin Law").  The official findings of the California legislature cite environmental, humanitarian, and health reasons in support of the Shark Fin Law.  Plaintiffs Chinatown Neighborhood Association and Asian Americans for Political Advancement challenge the Shark Fin Law because it allegedly discriminates against Chinese Californians since shark fins are a significant part of Chinese culture, and contend that it is unconstitutional because it denies them equal protection of the law, violates the Commerce Clause, is preempted by the federal Magnuson Stevens Act ("MSA"), 16 U.S.C. §§ 1801 *et seq.*, and deprives them of their constitutional rights under color of state law.

Defendants Kamala Harris, Attorney General of the State of California, and Charlton H. Bonham, Director of the California Department of Fish and Wildlife (collectively, "defendants"), who are responsible for enforcing the California Fish and Game Code, and intervenor-defendants Humane Society of the United States, Monterey Bay Aquarium Foundation, and Asian Pacific American Ocean Harmony Alliance (collectively, "intervenors") move to dismiss the First Amended Complaint ("FAC").  Because none of the claims is plausibly alleged, and the plaintiffs have no unpleaded facts that would change my analysis, I GRANT the motions to dismiss without

leave to amend.

**BACKGROUND**

The Shark Fin Law makes it "unlawful for any person to possess, sell, offer for sale, trade, or distribute a shark fin" in California. CAL. FISH & GAME CODE §§ 2021(b). Although the law contains limited exceptions,[1] a violation of the Shark Fin Law is a misdemeanor and may be punished by up to six months' imprisonment and a fine up to $1000. *See* CAL. FISH & GAME CODE § 12000. Before the Shark Fin Law was enacted, "California law already banned the practice of shark finning by prohibiting, subject to limited exceptions," the trading or possession on any commercial fishing vessel of "any shark fin or shark tail or portion thereof that has been removed from the carcass." FAC ¶ 19 (citing CAL. FISH & GAME CODE § 7704(c)).

In enacting the law, the California legislature made official findings included as part of the Shark Fin Law, including that: (a) sharks are critical to the health of the ocean ecosystem; (b) sharks are susceptible to population decline; (c) the loss of sharks threatens the ocean ecosystem and biodiversity; (d) the practice of shark finning causes tens of millions of sharks to die each year; (e) data show a decline in shark populations worldwide; (f) California is a market for shark fin and this demand helps drive shark finning and its attendant declines in shark population; and (g) shark fin contains high amounts of mercury, which is dangerous to human health. Intervenor Mot. 4 (citing Cal Stats. 2011, Ch. 524 (A.B. 376) § 1(a)-(g)). The California Assembly and Senate bill analyses of the law are consistent with these official findings. Intervenor Mot. RJN Ex. A & B.

Shark fins, which are primarily used to make shark fin soup, are a significant part of Chinese culture. *See* FAC ¶¶ 9-12. They are a "traditional symbol of respect, honor, and appreciation," and are a "ceremonial centerpiece of traditional Chinese banquets" and holidays. FAC ¶¶ 9-11. Before the Shark Fin Law was enacted, the shark fins traded and consumed in

---

[1] Among other provisions, three exceptions to the law exist for (i) holders of a license or permit for scientific or educational purposes; (ii) holders of a license or permit for "recreational or commercial purposes consistent with that permit"; or (iii) any restaurant that already possessed the shark fin prior to the law's effective date and which prepares it for consumption within a year of that date. FAC ¶ 16 (citing CAL. FISH & GAME CODE § 2021(c)-(e)).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    California were harvested from sharks caught by fishers both within California and in other

2    jurisdictions, including federal waters.  FAC ¶ 13.

3         The plaintiffs[2] allege that although the proponents of the Shark Fin Law ostensibly sought

4    to address shark finning (the specific practice of cutting a shark's fin off and discarding the

5    remainder of the shark at sea), shark population endangerment, and mercury consumption by

6    people, those justifications were a ruse.  FAC ¶¶ 25-29.  They also allege that the National

7    Oceanic and Atmospheric Administration Fisheries Service said that the notion that sharks are an

8    endangered species is a "MYTH."[3]  FAC ¶ 26.   Shark finning was already illegal under federal

9    law; sharks are not truly endangered and the proposed law did not ban shark fishing generally or

10   other shark products; the proposed law did not ban consuming other parts of sharks; and the

11   proposed law did not distinguish between shark fins harvested sustainably and humanely and

12   shark fins from unknown sources.  *See* FAC ¶¶ 25-29.

13        On the contrary, "Lawmakers and proponents of the Shark Fin Law have clearly and

14   repeatedly articulated that the intent of the Law was to target the Chinese market for shark fins and

15   to end the Chinese tradition of consuming shark fins."  FAC ¶ 30.  For example, California

16   Assemblyman Paul Fong, a co-sponsor of the law, compared the consumption of shark fin soup to

17   Chinese feet-binding on women.  FAC ¶ 30.  Peter Knights, Executive Director of a nonprofit

18   organization that promoted the law, WildAid, noted that it is easier to "regulate [ ] something

19   [that] is happening in Chinatown here" than "something that's going out on a boat in Indonesia in

20   the middle of the ocean."  FAC ¶ 30.

21        The plaintiffs allege that the Shark Fin Law has the effect of "prevent[ing] Chinese

22   Californians from engaging in ceremonial and cultural traditions that they have practiced for

23   _____

24   [2] Plaintiff Chinatown Neighborhood Association is a "nonprofit corporation/voluntary
     association" headquartered in San Francisco, California, and plaintiff Asian Americans for
25   Political Advancement is "a political action committee registered in the State of California and
     headquartered in Burlingame, California."  FAC ¶ 6, 7.  Their members are Chinese Californians
26   who, prior to the Shark Fin Law's implementation, "engaged in cultural and ceremonial traditions
     involving the use of shark fins and who possessed, sold, offered for sale, traded or distributed
27   shark fins in California that moved through the channels of interstate and foreign commerce."
     FAC ¶¶ 6, 7.
28   [3] The plaintiffs provide no citation for this quote.

centuries." FAC ¶ 31.  It prevents shark fins from passing through California in the stream of commerce with entities outside the state and attempts to regulate the fishing industry outside the state.  FAC ¶¶ 32-33.  They further claim that the law infringes on the federal government's authority to regulate federal waters and commercial and recreational fishing, and conflicts with federal laws, regulations, policies, and plans.  FAC ¶¶ 34-36.

## PROCEDURAL HISTORY

The plaintiffs filed this action on July 18, 2012.  Dkt. No. 1.  On August 9, 2012, the plaintiffs moved for a preliminary injunction to enjoin enforcement of the Shark Fin Law.  Dkt. No. 9.  The Honorable Phyllis J. Hamilton denied the motion, *Chinatown Neighborhood Ass'n v. Brown*, No. 12-cv-3759 PJH, 2013 WL 60919 (N.D. Cal. Jan. 2, 2013) ("*Brown I*"), and the United States Court of Appeals for the Ninth Circuit affirmed that decision on August 27, 2013, *Chinatown Neighborhood Ass'n v. Brown*, 539 F. App'x 761 (9th Cir. 2013) ("*Brown II*").

On June 27, 2013, this action was transferred to me.  Once the mandate was returned from the Ninth Circuit, the defendants filed a motion to dismiss.  Dkt. No. 47.  The plaintiffs then filed the FAC. [4]  Dkt. No. 50.  The defendants and intervenors filed separate motions to dismiss. [5]  Dkt. Nos. 58, 59.  I held a hearing on the motions on March 19, 2014.

The plaintiffs bring the following causes of action:  (1) violation of the Equal Protection Clause under the Fourteenth Amendment to the United States Constitution; (2) violation of the Commerce Clause, Article I, Section 8, Clause 3 of the United States Constitution; (3) violation of the Supremacy Clause, Article VI, Clause 2 of the United States Constitution; (4) violation of 41 U.S.C. § 1983; and (5) injunctive relief.  They seek a declaration that the Shark Fin Law violates these provisions, an injunction enjoining the defendants from enforcing the law, and reasonable attorney's fees and costs.

---

[4] Governor Edmund G. Brown Jr. was not named as a defendant, and defendants have withdrawn a motion to have him dismissed from the lawsuit.

[5] The parties made several requests for judicial notice along with their papers.  Dkt. Nos. 60, 62, 63, 64.  To the extent that this order cites to any of the materials therein, the requests are GRANTED.  The plaintiffs filed an objection to the defendants' request for judicial notice to the extent that I rely on the facts contained in the materials.  Dkt. No. 62-4.  That objection is not well taken, however, because, consistent with Federal Rule of Evidence 201, I do not do so.

**LEGAL STANDARD**

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). The court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party," *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008), drawing all "reasonable inferences" from those facts in the nonmoving party's favor, *Knievel v. ESPN*, 393 F.3d 1068, 1080 (9th Cir. 2005). A complaint may be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[A] complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and brackets omitted). In particular, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

"A facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). In other words, "the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). "[A] facial challenge must fail where the statute has a 'plainly legitimate sweep.'" *Id.* (citation omitted).

If a motion to dismiss is granted, a court should normally grant leave to amend unless it determines that the pleading could not possibly be cured by allegations of other facts. *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990).

**DISCUSSION**

**I.      WHETHER THE LAW OF THE CASE APPLIES**

The law of the case doctrine holds that "a court will generally refuse to reconsider an issue that has already been decided by the same court or a higher court in the same case." *Gonzalez v. Ariz.*, 677 F.3d 383, 389 n.4 (9th Cir. 2012). The "general rule" is that "decisions on preliminary

injunctions are not binding at trial on the merits, and do not constitute the law of the case." *S. Or. Barter Fair v. Jackson Cnty., Or.*, 372 F.3d 1128, 1136 (9th Cir. 2004) (citations omitted). Even a decision by the court of appeals concerning a preliminary injunction order is not automatically law of the case for the trial court. *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013). An exception to this "general rule" is that a higher court's conclusions on pure issues of law are binding, even when those issues were decided at the preliminary injunction phase. *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agr.*, 499 F.3d 1108, 1114 (9th Cir. 2007).

The intervenors argue that I should apply the "law of the case" doctrine to legal issues decided by Judge Hamilton and the Ninth Circuit at the preliminary injunction stage. The plaintiffs disagree. While I pay great attention to the well-reasoned opinions of Judge Hamilton and the Ninth Circuit, the law of the case only applies to two pure issues of law decided by the Ninth Circuit when it affirmed Judge Hamilton's order denying the motion for a preliminary injunction, with which I independently agree: (i) "[t]he Shark Fin Law is facially neutral," and (ii) the MSA "does not expressly preempt state law or occupy the entire field." *Brown II*, 539 F. App'x 761, 762-63 (9th Cir. 2013).

## II.    THE PLAINTIFFS FAIL TO STATE AN EQUAL PROTECTION CLAIM.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "It is because of this commitment to neutrality that legislative provisions which arbitrarily or irrationally create discrete classes cannot withstand constitutional scrutiny." *Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 981 (N.D. Cal. 2012) (citing *Romer v. Evans*, 517 U.S. 620, 623 (1996)). However, that commitment "must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631 (1996).

A law that explicitly involves racial classifications must be viewed through strict scrutiny and will survive only if the law is narrowly tailored to further compelling governmental interests.

United States District Court
Northern District of California

1   *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003).  "A facially neutral law, on the other hand,

2   warrants strict scrutiny only if it can be proved that the law was motivated by a racial purpose or

3   object, or if it is unexplainable on grounds other than race."  *Hunt v. Cromartie*, 526 U.S. 541, 546

4   (1999) (citations and quotation marks omitted).  "Intentional discrimination means that a

5   defendant acted at least in part *because of* a plaintiff's protected status."  *Maynard v. City of San*

6   *Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994).  If no racial purpose is shown, "a law will be sustained if

7   it can be said to advance a legitimate government interest, even if the law seems unwise or works

8   to the disadvantage of a particular group, or if the rationale for it seems tenuous."  *Romer*, 517

9   U.S. at 632.

10       The plaintiffs allege that the Shark Fin Law violates the Equal Protection Clause on its

11   face.  FAC ¶ 44.  They argue that because shark fin soup is "a distinctly Chinese cultural practice,"

12   and Chinese shark fin soup is the "only significant end market for shark fins in California," the

13   Shark Fin Law is, "in practical effect," discriminatory on the basis of national origin.  Opp'n 5.

14   Even if it is neutrally written, the law should be subject to strict scrutiny because it has "an

15   invidious discriminatory purpose."  Opp'n 6.  In particular, "multiple statements from the

16   legislative sponsors and proponents of the Shark Fin Law support the conclusion that the Shark

17   Fin Law was targeted at suppressing a Chinese cultural practice."  Opp'n 7 (citing FAC ¶ 30).

18   Furthermore, the law has a disparate impact on the Chinese Californian community, and the

19   defendants have not disputed this.  Opp'n 6.

20       The plaintiffs are mistaken.  Nothing in the Shark Fin Law's text discriminates on the basis

21   of race, ethnicity, cultural background, or national origin.  Rather, it is a broadly applicable law

22   that prohibits the possession or sale of shark fin.  Every person in California is subject to the law.

23   As the Ninth Circuit held, the law "is facially neutral."  *Brown II*, 539 F. App'x at 762.

24       Because the Shark Fin Law is facially neutral, the plaintiffs must plead sufficient facts to

25   show that the Shark Fin Law was enacted for the purpose of discriminating on account of race in

26   order to subject the law to strict scrutiny, i.e., the law was passed "because of" the plaintiffs'

27   members' race or background.  *Hunt*, 526 U.S. at 546; *Maynard*, 37 F.3d at 1404.  The plaintiffs

28   have not done this.  The FAC only provides conclusory allegations but almost no "further factual

1    enhancement" to support them.  *Iqbal*, 556 U.S. at 678.

2          The plaintiffs allege that "[l]awmakers and proponents of the Shark Fin Law have clearly

3    and repeatedly articulated that the intent of the Law was to target the Chinese market for shark fins

4    and to end the Chinese tradition of consuming shark fins."  FAC ¶ 30.  While the allegation is

5    literally true in that the law is meant to prohibit the sale and possession (and, thus, consumption)

6    of shark fin, the overarching implication that the law was racially motivated is not borne out by

7    the statements cited by the plaintiffs.  Assemblyman Fong's statements that "the Chinese culture

8    used to promote foot binding on women" and "[j]ust like it was unhealthy to bind women's feet,

9    this practice needs to end" does not evince racial motivation in sponsoring the Shark Fin Law.

10   FAC ¶ 30.  Rather, the quotes say nothing more than that certain acts that were once permitted

11   should now be stopped in light of contemporary circumstances and standards.  That the example

12   used is drawn from Chinese history does not plausibly suggest discriminatory purpose.  Similarly,

13   Knights's statement that "[i]t's very difficult to regulate something that's going out on a boat in

14   Indonesia in the middle of the ocean.  It's very easy to regulate if something is happening in

15   Chinatown here.  Very easy to go 'round to restaurants and find out who's having what," FAC ¶

16   30, makes the unremarkable point that California can more easily regulate what occurs here than

17   in another country.  Neither of these two statements plausibly shows discriminatory purpose.

18   Even read in the harshest light, these stray comments of one legislator and one supporter of the

19   legislation are hardly sufficient to plausibly allege intent to discriminate.[6]

20         The plaintiffs allege that the Shark Fin Law has a disparate impact on people of Chinese

21   origin "because it bears almost exclusively on people of Chinese national origin by suppressing

22   the practice of Chinese ceremonial and cultural traditions."  Opp'n 10.  People of Chinese origin

23   or culture undoubtedly overwhelmingly comprise the market for shark fin.  However, a law is not

24   unconstitutional simply because it has a racially disparate impact.  "[E]ven if a neutral law has a

25   _____

26   [6] At the hearing, counsel for the plaintiffs repeatedly cited to *California Parents for Equalization
     of Educational Materials v. Noonan*, 600 F. Supp. 2d 1088 (E.D. Cal. 2009), to support their
27   argument that their FAC has pleaded sufficiently to at least survive a motion to dismiss.  But the
     factual allegations of discriminatory statements and actions in *Noonan* far exceed what is pleaded
28   here, so that case does not help the plaintiffs.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal

2   Protection Clause only if that impact can be traced to a discriminatory purpose." *Pers. Adm'r of*

3   *Mass. v. Feeney*, 442 U.S. 256, 272 (1979).  Discriminatory purpose "implies that the

4   decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action

5   at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable

6   group." *Id.* at 279.  The Supreme Court "ha[s] not held that a law, neutral on its face and serving

7   ends otherwise within the power of government to pursue, is invalid under the Equal Protection

8   Clause simply because it may affect a greater proportion of one race than of another." *Washington*

9   *v. Davis*, 426 U.S. 229, 242 (1976).  "Disproportionate impact is not irrelevant, but it is not the

10  sole touchstone of an invidious racial discrimination forbidden by the Constitution.  Standing

11  alone, it does not trigger the rule that racial classifications are to be subjected to the strictest

12  scrutiny and are justifiable only by the weightiest of considerations." *Id.* (citation omitted).

13          Because the Shark Fin Law need not be strictly scrutinized, it must only have a rational

14  basis to be sustained.  *Romer*, 517 U.S. at 632.  "Under the rational basis review, a law must be

15  rationally related to the furtherance of a legitimate governmental interest." *Golinski*, 824 F. Supp.

16  2d at 981.  In other words, the law "must be upheld against equal protection challenge if there is

17  any reasonably conceivable state of facts that could provide a rational basis for the classification."

18  *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 2096, 2101 (1993) (citations omitted).  Where there are

19  "plausible reasons" for the legislature's actions, the "inquiry is at an end." *Id.*  "[A] legislative

20  classification subject to rational basis scrutiny must be wholly irrational to violate equal

21  protection." *Fields v. Legacy Health Sys.*, 413 F.3d 943, 955 (9th Cir. 2005) (quotation marks

22  omitted).  "The burden is on the one attacking the legislative arrangement to negative every

23  conceivable basis which might support it, whether or not the basis has a foundation in the record."

24  *Heller v. Doe*, 509 U.S. 312, 320-21 (1993) (citation and internal punctuation omitted).  "Finally,

25  courts are compelled under rational-basis review to accept a legislature's generalizations even

26  when there is an imperfect fit between means and ends." *Teixeira v. Cnty. of Alameda*, No. 12-cv-

27  03288, 2013 WL 4804756, at *9 (N.D. Cal. Sept. 9, 2013) (quoting *Heller*, 509 U.S. at 321).  The

28  legislature does not need to show that its law, subject only to rational basis review, "is the best

1    way to achieve [its] goals." *Id.*

2         As Judge Hamilton recognized, the Shark Fin Law

3         is based on legislative findings that sharks occupy the top of the marine food chain and
         their decline constitutes a serious threat to the ocean ecosystem and biodiversity; that the
4         practice of shark finning causes the death of tens of millions of sharks every year; and that
         by eliminating an important end market (sales in California), and thereby impacting the
5         demand for shark fins, California can help ensure that sharks do not become extinct.

6    *Brown I*, 2013 WL 60919, at *7 (citing 2011 Cal. Stat., Ch. 524 (A.B. 376), § 1).  These

7    "humanitarian, conservationist, and health goals" are legitimate government interests.  *Brown II*,

8    539 Fed. App'x at 762.  The law bans all shark fins, regardless of origin or point of sale.  While

9    the plaintiffs suggest that the law is not well-tailored to its purported ends, that is insufficient to

10   invalidate the law.  Under rational basis review, a court should not expect the legislature to design

11   a scheme that perfectly addresses the court's own concerns, nor should a court impose other

12   methods that it would prefer.  *Schweiker v. Wilson*, 450 U.S. 221, 235 (1981).  The plaintiffs have

13   not carried their burden of plausibly alleging the lack of any rational basis by negating every

14   conceivable basis supporting the law or showing that it is wholly irrational.[7]  *Heller*, 509 U.S. at

15   320-21.

16        At the hearing, the plaintiffs repeatedly urged that this case is at the pleading stage and that

17   they had alleged enough to survive a motion to dismiss even if they did not have the evidence yet

18   to prevail at trial.  But the plaintiffs' allegations concerning racial intent do not go anywhere close

19   to bringing their claims past the "line between possibility and plausibility."  *Iqbal*, 556 U.S. at

20   678.  "When faced with two possible explanations, only one of which can be true and only one of

21   which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their

22   favored explanation but are also consistent with the alternative explanation.  Something more is

23   needed, such as facts tending to exclude the possibility that the alternative explanation is true, in

24

25   _____

26   [7] The entirety of the plaintiffs' argument about why the Shark Fin Law does not survive the
     rational basis test is a single sentence in a footnote stating that, "as is clear from the NOAA
27   statements on shark population health, anti-finning regulations, and the fact that sustainable shark
     fishing is practiced widely, there is no rational basis for such an overbroad statute banning shark
28   fins."  Opp'n 10 n.4.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*."  *In re*

2  *Century Alum. Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (citations omitted); *Iqbal*, 556

3  U.S. at 682 ("As between that 'obvious alternative explanation' . . . and the purposeful, invidious

4  discrimination respondent asks us to infer, discrimination is not a plausible conclusion.").  The

5  plaintiffs must plead sufficient facts showing that they are plausibly entitled to relief before those

6  facts may be weighed by a jury.  Aside from the two statements discussed earlier, the plaintiffs

7  allege no other facts to support their claim, and their counsel conceded at oral argument that he

8  knew of no other relevant facts that he could assert.  Accordingly, I will dismiss the Equal

9  Protection cause of action.

10  **III.    THE PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE COMMERCE**

11  **CLAUSE.**

12          The Commerce Clause authorizes Congress to "regulate Commerce with foreign Nations,

13  and among the several States . . . ."  U.S. CONST., art. I, § 8, cl. 3.  "Although the Commerce

14  Clause is by its text an affirmative grant of power to Congress to regulate interstate and foreign

15  commerce, the Clause has long been recognized as a self-executing limitation on the power of the

16  States to enact laws imposing substantial burdens on such commerce."  *South-Central Timber*

17  *Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984).  This doctrine is known as the "dormant

18  Commerce Clause."  "The principal objects of dormant Commerce Clause scrutiny are statutes

19  that discriminate against interstate commerce."  *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S.

20  69, 87 (1987).  "The central rationale for the rule against discrimination is to prohibit state or

21  municipal laws whose object is local economic protectionism" because these are the "laws that

22  would excite those jealousies and retaliatory measures the Constitution was designed to prevent."

23  *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994).

24          "[U]nder our constitutional scheme the States retain broad power to legislate protection for

25  their citizens in matters of local concern such as public health" and "not every exercise of local

26  power is invalid merely because it affects in some way the flow of commerce between the States."

27  *Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 371 (1976) (internal quotations and citations

28  omitted).  "To determine whether a law violates this so-called 'dormant' aspect of the Commerce

1    Clause, [a court must] first ask whether it discriminates on its face against interstate commerce."

2    *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007).  In

3    other words, is there "differential treatment of in-state and out-of-state economic interests that

4    benefits the former and burdens the latter"?  *Id.*  If so, the law is likely invalid.  *Brown-Forman*

5    *Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986).  "[A] state regulation does

6    not become vulnerable to invalidation under the dormant Commerce Clause merely because it

7    affects interstate commerce."  *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144,

8    1148 (9th Cir. 2012).  Rather, "[a] critical requirement for proving a violation of the dormant

9    Commerce Clause is that there must be a *substantial burden* on *interstate commerce*."  *Id.*

10   (original emphasis).  "When, however, a statute has only indirect effects on interstate commerce

11   and regulates evenhandedly, [a court need only] examine[ ] whether the State's interest is

12   legitimate and whether the burden on interstate commerce clearly exceeds the local benefits."

13   *Brown-Forman Distillers*, 476 U.S. at 579.

14        The plaintiffs argue, "By prohibiting all interstate and foreign trade of shark fins involving

15   the state of California, the Shark Fin Law directly regulates interstate and foreign commerce.

16   Furthermore, by banning sales of shark fins to, from and through California, the Shark Fin Law

17   improperly restricts commerce by removing California from the national and global marketplace."

18   Opp'n 10.  In particular, they assert that the law "regulate[s] out-of-state conduct involving

19   commercial shark fisheries and the trade of shark products."  Opp'n 10.  "[S]hark fins cannot even

20   pass *through* California in the stream of commerce to be sold in other states or countries,

21   essentially regulating commerce that only incidentally involves California."  Opp'n 11.  "[T]his

22   type of extraterritorial regulatory reach effectuated by the Shark Fin Law is impermissible under

23   the Commerce Clause."  Opp'n 11.

24        The Shark Fin Law does not violate the dormant Commerce Clause.  As an initial matter,

25   the law does not discriminate against interstate commerce—there is nothing in the statute that

26   privileges California commerce over non-California commerce or that engages in "economic

27   protectionism."  *C & A Carbone*, 511 U.S. at 390.  With few exceptions, the law mandates that no

28   person in California may possess or sell shark fin.  As Judge Hamilton found, the law "treats all

United States District Court
Northern District of California

12

shark fins the same, regardless of their origin." *Brown I*, 2013 WL 60919, at *8. Even "[a] ban that simply effectuates a complete ban on commerce in certain items is not discriminatory, as long as the ban on commerce does not make distinctions based on the origin of the items." *Pac. Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1012 (9th Cir. 1994). Here, the in-state and out-of-state interests are affected the same way. A ban that treats all parties the same and prohibits an item regardless of its origin is not discriminatory. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 948 (9th Cir. 2013).

The plaintiffs wrongly argue that the Shark Fin Law imposes "California's regulatory scheme on fishing and fishing products industries outside of California's borders." Def.'s Mot. 16 (quoting FAC ¶ 51). The Supreme Court has held that "a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). The Shark Fin Law, however, only regulates the possession, trade, and distribution of shark fin within California. CAL. FISH & GAME CODE § 2021(b).

Though California's law may have some effect outside the state, that is of little consequence since this is not the "projection of one state regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 337. Those states remain free to regulate shark fin however they wish within their boundaries. *See Brown-Forman Distillers*, 476 U.S. at 583; *see also Gerling Global Reinsurance Corp. of Am. v. Low*, 240 F.3d 739, 746 (9th Cir. 2001) (holding law did not violate Commerce Clause where law, "on its face, does not regulate foreign insurance policies, or control the substantive conduct of a foreign insurer, or otherwise affect 'the business of insurance' in any other country"). That out-of-state fins may not be sold or distributed in California is only an incidental effect of the law that does not violate the Commerce Clause. *See Cottrell*, 424 U.S. at 371 ("not every exercise of local power is invalid merely because it affects in some way the flow of commerce between the States"). Absent discrimination of products based on origin, "the States retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected." *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 36 (1980).

United States District Court
Northern District of California

13

United States District Court
Northern District of California

1  The plaintiffs argue that the Shark Fin Law does not serve a legitimate local purpose and

2  its benefits outweigh any burden on interstate commerce.  In *Pike v. Bruce Church, Inc.*, 397 U.S.

3  137, 142 (1970), the Supreme Court set out the test for determining whether "the burden imposed

4  on [interstate] commerce is clearly excessive in relation to the putative local benefits."  *See City of*

5  *Phila. v. N.J.*, 437 U.S. 617, 624 (1978).  "Where the statute regulates even-handedly to effectuate

6  a legitimate local public interest, and its effects on interstate commerce are only incidental, it will

7  be upheld unless the burden imposed on such commerce is clearly excessive in relation to the

8  putative local benefits."  *Pike*, 397 U.S. at 142.  "If a legitimate local purpose is found, then the

9  question becomes one of degree.  And the extent of the burden that will be tolerated will of course

10  depend on the nature of the local interest involved, and on whether it could be promoted as well

11  with a lesser impact on interstate activities."  *Id.*

12  A plaintiff must show a substantial burden to interstate commerce before the *Pike* test need

13  be applied.  *Ass'n des Eleveurs de Canards et d'Oies du Quebec*, 729 F.3d at 951-52; *Nat'l Ass'n*

14  *of Optometrists & Opticians*, 682 F.3d at 1148.  Significant burdens include statutes that

15  discriminate or create "inconsistent regulation of activities that are inherently national or require a

16  uniform system of regulation."  *Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1148; *see*

17  *also Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 n.12 (1997) ("[C]ases that have purported to

18  apply the undue burden test (including *Pike* itself) arguably turned in whole or in part on the

19  discriminatory character of the challenged state regulations. . . . [A] small number of [ ] cases have

20  invalidated state laws under the dormant Commerce Clause that appear to have been genuinely

21  nondiscriminatory, in the sense that they did not impose disparate treatment on similarly situated

22  in-state and out-of-state interests, where such laws undermined a compelling need for national

23  uniformity in regulation.").  The Supreme Court has even recognized states' "right to impose even

24  burdensome regulations in the interest of local health and safety."  *H. P. Hood & Sons, Inc. v. Du*

25  *Mond*, 336 U.S. 525, 535 (1949).

26  The plaintiffs argue that "the FAC adequately allege[s] that the Shark Fin Law unduly

27  burdens interstate commerce in violation of the first part of the *Pike* test."  Opp'n 11 (citing FAC

28  ¶¶ 13, 32-33, 47-54).  "On its face, the Shark Fin Law is an explicit restriction of commerce and,

14

1   as previously stated, the Shark Fin Law was expressly enacted for the purpose of restricting

2   interstate and foreign commerce both in and through California." Opp'n 11.  The plaintiffs state

3   that there may be some "negative economic effects" of the Shark Fin Law on certain entities on

4   the west coast, in the western Pacific, and other fisheries.  Opp'n 11 n.5 (citing Pl.'s RJN Ex. A

5   (Magnuson-Stevens Act Provisions; Implementation of the Shark Conservation Act of 2010, 78

6   FED. REG. 25,685, 25,689 (May 2, 2013)).  And while the law is supposed to protect the public

7   from mercury consumption, it does not restrict consumption of other parts of the shark or other

8   sources of mercury—"[a]s such, the alleged public health goals are so marginally furthered as to

9   be illusory while the impact on commerce is great, and the Shark Fin Law cannot pass *Pike* test

10  muster."  Opp'n 12.

11          The plaintiffs fail to plausibly allege that the Shark Fin Law places a substantial burden on

12  commerce.  As discussed above, the law is not discriminatory and the plaintiffs do not identify any

13  burden to the interstate or foreign market for shark fin aside from the fact that it cannot be sold in

14  California.  The FAC also does not contain any factual allegation that the regulation of the

15  possession or sale of shark fin is "inherently national" or requires a "uniform system of

16  regulation."  *Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1148.  The plaintiffs only

17  provide a conclusory statement that it does.  *See* FAC ¶ 52.

18          In any event there is no need to apply the balancing test in *Pike*.  "If a regulation merely

19  has an effect on interstate commerce, but does not impose a significant burden on interstate

20  commerce, it follows that there cannot be a burden on interstate commerce that is 'clearly

21  excessive in relation to the putative local benefits' under *Pike*.  Accordingly, where, as here, there

22  is no discrimination and there is no significant burden on interstate commerce, we need not

23  examine the actual or putative benefits of the challenged statutes."  *Nat'l Ass'n of Optometrists &*

24  *Opticians*, 682 F.3d at 1155.  It is true that "[a] facially neutral statute may violate the Commerce

25  Clause if the burdens of the statute so outweigh the putative benefits as to make the statute

26  unreasonable or irrational."  *UFO Chuting of Haw., Inc. v. Smith*, 508 F.3d 1189, 1196 (9th Cir.

27  2007) (internal punctuation omitted).  A statute is unreasonable or irrational when "the asserted

28  benefits of the statute are in fact illusory or relate to goals that evidence an impermissible

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1    favoritism of in-state industry over out-of-state industry." *Id.* But as explained earlier, the

2    protection of public health and wildlife are legitimate state interests. *See Merrifield v. Lockyer*,

3    547 F.3d 978, 986 (9th Cir. 2008) (finding a government interest in public health); *Smitch*, 20 F.3d

4    at 1013 (finding a government interest in wildlife)). The plaintiffs cannot seriously dispute this.

5    "Regulations promulgated pursuant to the state's interest in the preservation of its wildlife carry a

6    strong presumption of validity." *Smitch*, 20 F.3d at 1014. Because the plaintiffs only make

7    unsupported assertions but provide no facts to buttress their claims, that strong presumption of

8    validity is not rebutted. The plaintiffs fail to state a claim that the Shark Fin Law violates the

9    Commerce Clause.

10   **IV.    THE SHARK FIN LAW IS NOT PREEMPTED.**

11         "There are three categories of preemption: express, field, and conflict. Field and conflict

12   preemption are subcategories of implied preemption." *Stengel v. Medtronic Inc.*, 704 F.3d 1224,

13   1230 (9th Cir. 2013) (citation omitted). Express preemption occurs when there is "language in the

14   federal statute that reveals an explicit congressional intent to pre-empt state law." *Barnett Bank of*

15   *Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 31 (1996). Field preemption may be found when there

16   is a "scheme of federal regulation so pervasive as to make reasonable the inference that Congress

17   left no room for the States to supplement it, or where an Act of Congress touches a field in which

18   the federal interest is so dominant that the federal system will be assumed to preclude enforcement

19   of state laws on that subject." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (citation and

20   internal punctuation omitted). Conflict preemption occurs when it would be "impossible for a

21   private party to comply with both state and federal requirements," *English*, 496 U.S. at 79, or

22   where the state law "stands as an obstacle to the accomplishment and execution of the full

23   purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). "Congress's

24   intent to preempt state law is implied to the extent that federal law actually conflicts with any state

25   law." *Whistler Investments, Inc. v. Depository Trust & Clearing Corp.*, 539 F.3d 1159, 1164 (9th

26   Cir. 2008).

27         Judge Hamilton held that the Shark Fin Law is not preempted. *Brown I*, 2013 WL 60919,

28   at *8. The Ninth Circuit affirmed her decision and held as a matter of law that neither express nor

field preemption applies to the Shark Fin Law.[8]  *Brown II*, 539 Fed. App'x at 763.  I must decide whether conflict preemption applies to invalidate the Shark Fin Law.

The plaintiffs argue that the Shark Fin Law is in conflict with the federal government's exclusive authority over fishing in the exclusive economic zone ("EEZ") created by the federal Magnuson Stevens Act ("MSA") because while a fisher may land a shark caught in the EEZ in compliance with federal law, the fisher is not permitted to possess, sell, or trade the shark's fin in California.  To address this argument, I must first consider the purpose of the MSA and its relevance to shark finning.

The MSA was enacted to "conserve and manage [ ] fishery resources," "promote domestic commercial and recreational fishing under sound conservation and management principles," and "achieve and maintain, on a continuing basis, the optimum yield from each fishery."  16 U.S.C. § 1801(b)(1), (3), (4).  It promotes commercial fishing, subject to conservation and management measures, and recognizes that "[c]ommercial and recreational fishing constitutes a major source of employment and contributes significantly to the economy of the Nation."  16 U.S.C. § 1801(a)(3).  The MSA establishes a framework in which the federal government works with states and other entities in regional Fishery Management Councils to create Fisheries Management Plans ("FMPs") and set federal regulations concerning fishing in United States waters.  16 U.S.C. §§ 1852, 1853.

The MSA provides the federal government authority to regulate not only the harvesting of fish, but also, to a certain extent, their possession and sale.  *See* 16 U.S.C. § 1853(b)(3).  FMPs established pursuant to the MSA must "prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry," minimize adverse economic impacts on fishing communities, consider efficiency in the utilization of fishery resources, and comply with other substantive and procedural requirements.  *See* 16 U.S.C.

---

[8] I agree with the Ninth Circuit's conclusion:  the plaintiffs have identified no federal law that expressly preempts state law.  In fact, federal law explicitly leaves room for states to occupy the same field.  *See, e.g.*, 16 U.S.C. § 1856(a) ("nothing in this chapter shall be construed as extending or diminishing the jurisdiction or authority of any State within its boundaries"); 50 C.F.R. § 600.1201(c) ("Nothing in this regulation supercedes [sic] more restrictive state laws or regulations regarding shark finning in state waters.").

§§ 1851(a), 1853(a), 1854(e).

The United States has "sovereign rights and exclusive fishery management authority over all fish, and all Continental Shelf fishery resources, within the exclusive economic zone" ("EEZ"). 16 U.S.C. § 1811(a).  The EEZ extends from the seaward boundary of the states to a boundary 200 nautical miles from the baseline from which the breadth of the territorial sea is measured.  16 U.S.C. § 1802(11); Proclamation No. 5030, 48 Fed. Reg. 10,605 (Mar. 10, 1983).  The MSA explicitly states that nothing in it "shall be construed as extending or diminishing the jurisdiction or authority of any State within its boundaries," including the waters within those boundaries.  16 U.S.C. § 1856.  States generally have authority over fishing within the boundaries of the state, which for most states extends three miles seaward from the coastline.[9]  18 U.S.C. § 1856(a)(1)-(2); *see also* 43 U.S.C. § 1301 *et seq.*

Federal law regulates the harvesting of shark fin by prohibiting the harvesting of shark fin while disposing the shark carcasses at sea, though it does not ban the sale or possession of shark fin generally.  *See* 16 U.S.C. § 1857(1)(P).  In particular, the MSA prohibits removing the fins of a shark at sea or bringing any fin on land without the rest of the shark's body attached.  The law does not regulate what occurs to shark fins after they have been taken onto land.

On appeal of Judge Hamilton's denial of a preliminary injunction, the United States filed an amicus brief expressing concern that federal law preempted the Shark Fin Law, *id.*; *see also* Opp'n RJN Ex. B.  The federal government now takes the position that both laws are consistent and that federal law does not preempt the Shark Fin Law.[10]  *See* Letter from Eileen Sobeck, Asst. Admin'r for Fisheries, Nat'l Oceanic & Atmospheric Admin. to Charlton H. Bonham, Director, Cal. Dep't of Fish & Wildlife (Feb. 3, 2014), Def.'s Reply RJN Ex. E.  After a series of discussions about the Shark Fin Law, the California Department of Fish and Wildlife wrote to the

---

[9] The EEZ "begins where California waters end—three nautical miles from shore—until 200 nautical miles off shore."  *Dairy v. Bonham*, No. 13-cv-1518-EMC, 2013 WL 6443352, at *1 (N.D. Cal. Dec. 9, 2013).

[10] It also has not accepted the Ninth Circuit's implied invitation to raise any preemption concerns with this Court.  *See Brown II*, 539 Fed. App'x at 763 ("The government is, of course, not foreclosed from raising these [preemption] arguments in the permanent injunction proceedings.").

United States District Court
Northern District of California

United States District Court
Northern District of California

National Marine Fisheries Service ("NMFS") of the United States Department of Commerce,

which administers the MSA, to confirm their mutual understanding of the laws:

> [W]e now agree that California law and federal law are consistent and that there is no basis
> for finding California's Shark Fin Prohibition to be preempted by the Magnuson-Stevens
> Act, as amended.  The Magnuson-Stevens Act governs the management of federal
> fisheries, including shark fisheries.  As we have discussed, the Shark Fin Prohibition and
> the Magnuson-Stevens Act, as amended, share a goal of promoting conservation and
> ending the practice of shark finning.  To this end, the California Shark Fin Prohibition
> proscribes the possession, sale, trade, and distribution of detached shark fins in California.
> *See* Cal. Fish & Game Code §§ 2021 (a)&(b).  Of particular significance here, and unlike
> federal law, the California Shark Fin Prohibition does not regulate the act of finning or the
> taking and landing of sharks within the Exclusive Economic Zone (EEZ).  Moreover,
> under California law, a federally-licensed fisher may land a shark in California with the
> fins attached, as required by the Shark Conservation Act of 2010.

Letter from Charlton H. Bonham, Director, Cal. Dep't of Fish & Wildlife, to Eileen Sobeck, Asst.

Adm'r for Fisheries, Nat'l Oceanic & Atmospheric Admin. (Feb. 3, 2014), Def.'s Reply RJN Ex.

D.  The Assistant Administrator of the NMFS responded:

> [Y]ou confirm that all federal fishers who land sharks in California, including those who
> operate in federal waters pursuant to a federal license, are also required to hold state
> licenses and are therefore exempt from the ban on possession of shark fins.  Based on the
> full information about the California law set forth in your letter . . . we agree with your
> conclusion that California's Shark Fin Prohibition law will have minimal impact on
> federally licensed and permitted shark harvesters in California, and does not unlawfully
> burden their ability to achieve the benefits from federal fisheries provided under the
> Magnuson-Stevens Fishery Conservation and Management Act, as amended.  Accordingly,
> it is our position, based on the information that you have provided, that California's Shark
> Fin Prohibition law is not preempted by the Magnuson-Stevens Act, as amended.

Def.'s Reply RJN Ex. E.  This is persuasive evidence that the Shark Fin Law is not conflict

preempted.[11]  *See Wyeth v. Levine*, 555 U.S. 555, 576-77 (2009) ("While agencies have no special

---

[11] The plaintiffs assert that the NMFS has explicitly stated that federal shark finning laws were not
intended to prohibit the possession or sale of shark fins, citing to a May 3, 2013, notice of
proposed rulemaking published in the Federal Register.  Magnuson-Stevens Act Provision;
Implementation of the Shark Conservation Act of 2010, 78 Fed. Reg. 25,685, 25,686 (May 2,
2013), Pl.'s RJN Ex. A.  The notice stated that federal law "reflects a balance between addressing
the wasteful practice of shark finning and preserving opportunities to land and sell sharks
harvested consistent with the Magnuson-Stevens Act." *Id.*  It continues, "[P]romoting commercial
fishing under sound conservation and management principles is a key purpose of the [MSA].  If
sharks are lawfully caught in federal waters, state laws that . . . prohibit the sale, transfer or
possession of fins from those sharks unduly interfere with achievement of the [MSA] purposes
and objectives." *Id.* at 25,687.  In addition, the savings clause in 50 C.F.R. 600.1201(c), which

United States District Court
Northern District of California

1    authority to pronounce on pre-emption absent delegation by Congress, they do have a unique

2    understanding of the statutes they administer and an attendant ability to make informed

3    determinations about how state requirements may pose an 'obstacle to the accomplishment and

4    execution of the full purposes and objectives of Congress.'").

5         The plaintiffs do not adequately allege that it is impossible to comply with both state and

6    federal law or that the Shark Fin Law impedes Congress' intent.  The purposes of the MSA

7    include conservation and effective management of fisheries.  *See* 16 U.S.C. § 1801(b).  It regulates

8    activity in the EEZ.  *See* 16 U.S.C. § 1802(11).  While the federal shark finning law prohibits the

9    landing of shark fin unattached to the carcass, it does not regulate what happens to shark fins once

10   they are on land, nor does it regulate the sale of shark fin.  *See* 50 C.F.R. § 600.1200-1204.  On the

11   other hand, the Shark Fin Law only prohibits the trading or possession of a shark fin.  It does not

12   regulate activity (including finning) in the EEZ or conflict with any of the purposes of federal law.

13   As Judge Hamilton explained in concluding that the plaintiffs have not established that it is

14   impossible to comply with both laws, "[f]ederal law primarily regulates shark finning and the

15   taking and landing of sharks within U.S. waters, while the Shark Fin Law prohibits the sale, trade,

16   or possession of shark fins in California."  *Brown I*, 2013 WL 60919, at *9.

17        There is no conflict between the federal law governing shark finning and the Shark Fin

18   Law.  The purpose of the federal shark fin law is to eliminate shark finning.  *United States v.*

19   *Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 982 (9th Cir. 2008).  The Shark Fin

20   Law is consistent with this purpose.  What the two laws mandate do not conflict.  The federal law

21   prohibits (i) "remov[ing] any of the fins of a shark (including the tail) *at sea*"; (ii) "possession of

22   any such fin *aboard a fishing vessel* unless it is naturally attached to the corresponding carcass";

23   (iii) receipt or transfer of any fin not naturally attached to the corresponding carcass; and (iv)

24

---

25   states that "[n]othing in this regulation supercedes more restrictive state laws or regulations
     regarding shark finning in state waters," "was not intended to imply that states may interfere with

26   or impede accomplishment of fishery management objectives for federally-managed commercial
     recreational fisheries."  *Id.*  The plaintiffs note that the proposed rule was closed to public

27   comment on July 31, 2013, and that no action has been taken to date.  Opp'n 19 n.11.  While these
     statements arguably support the plaintiffs' position, they appear superseded by the views

28   expressed by the NMFS in its letter to the California Department of Fish and Wildlife.

"land[ing] any such fin that is not naturally attached to the corresponding carcass, or [landing] any shark carcass without such fins naturally attached."  16 U.S.C. § 1857(1)(P) (emphases added). As the law makes plain, it only regulates activity at sea, aboard a vessel, and during landing—it does not regulate the possession or trading of shark fin post-landing in California, as the Shark Fin Law does.  CAL. FISH & GAME CODE § 2021(b).  The federal government still maintains exclusive authority over shark-finning activities within the EEZ.  A fisher may capture a shark in the EEZ in accordance with federal law and bring it to California's shore without running afoul of state law. Indeed, the Shark Fin Law allows the possession or trading of whole sharks, which is the form that federal law allows to be landed.  CAL. FISH & GAME CODE § 2021(a) (defining "fin" as a detached fin or tail).  The law also allows possession for personal use of shark fin, e.g., consumption and taxidermy, by license holders.  See CAL. FISH & GAME CODE § 2021.5.  Complying with both the Shark Fin Law and federal law is possible and there is no conflict preemption.

Similarly there is no conflict between the Shark Fin Law and the MSA generally.  The MSA is intended to preserve the nation's fishery resources and to promote conservation.[12]  As the plaintiffs point out, achieving "optimum yield" is also a purpose of the law.  16 U.S.C. § 1801(b)(4) & (6).  "Optimum yield" "means the amount of fish which will provide the greatest overall benefit to the Nation . . . taking into account the protection of marine ecosystems . . . prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor."  16 U.S.C. § 1802(33).  But this does not suggest congressional intent to maximize fishing or the sale of fish (since social, economic, and ecological factors also matter) such that prohibiting the sale of shark fin would go against an MSA policy.  Nothing in the MSA requires a state to allow the possession or trading of shark fin—even shark fin lawfully landed—so prohibiting the possession or sale of shark fin in California is not an obstacle to Congress' intent in enacting the MSA.  On the other hand, nothing

---

[12] The D.C. Circuit has held that "under the Fishery Act, the [NMFS] must give priority to conservation measures.  It is only when two different [MFPs] achieve similar conservation measures that the [NMFS] takes into consideration adverse economic consequences.  This is confirmed both by the statute's plain language and the regulations issued pursuant to the statute." *Natural Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000).

United States District Court
Northern District of California

about the Shark Fin Law regulates the capture and landing of sharks.  Because the Shark Fin Law and MSA can coexist, there is no conflict preemption.

The plaintiffs argue that although the Shark Fin Law does not apply to the actual act of fishing in the EEZ, but to the possession and trading of shark fin, the law is still preempted because it cannot be the case that federal law permits harvesting shark fin in the EEZ but the Shark Fin Law prevents possession or sale of that fin.  Opp'n 15; *see also* FAC ¶ 36.  In particular, the law affects "the ability to possess and place into commerce fish caught in federal waters."  Opp'n 16 (citing 16 U.S.C. § 1802(4) (defining commercial fishing as "fishing in which the fish harvested, either in whole or in part, are intended to enter commerce or enter commerce through sale, barter or trade")).  They assert that "federal law's silence on the activity prohibited by state law is enough to create a conflict."  Opp'n 17.  The plaintiffs cite *City of Charleston, S.C. v. A Fisherman's Best, Inc.*, 310 F.3d 155, 177 (4th Cir. 2002), and *Vietnamese Fishermen Ass'n of Am. v. Cal. Dep't of Fish & Game*, 816 F. Supp. 1468, 1475 (N.D. Cal. 1993), in support.

Neither of these cases help the plaintiffs.  In both *City of Charleston* and *Vietnamese Fishermen*, there was a Fisheries Management Plan ("FMP") in place, but state and local measures impeded what the FMP allowed (in the latter case, implicitly).[13]  As *City of Charleston* aptly put it, "When an FMP is in effect and a fisherman has harvested fish in federal waters and is headed for shore to land his cargo, the state cannot exercise its authority over state waters for the purpose or effect of preventing him from [doing so]."  816 F. Supp. at 177.  Here, the plaintiffs have not alleged that there is an FMP—or, indeed, any other law or measure—in place which authorizes the harvesting or sale of shark fin or imposes regulations concerning it.  All that the MSA and the federal shark finning law say with regard to shark finning is that no one may have a fin unattached from the corresponding carcass, and the Shark Fin Law does not thwart this requirement.

Contrary to the plaintiff's assertion, the fact that Congress did not prohibit the sale of shark fin does not mean that state laws banning it are preempted.  Not banning some activity is not the

---

[13] Two other cases cited by the plaintiffs are distinguishable from this action for this same reason: *Southeastern Fisheries Ass'n, Inc. v. Chiles*, 979 F.2d 1504, 1510 (11th Cir. 1992), and *Southeastern Fisheries Ass'n, Inc. v. Mosbacher*, 773 F. Supp. 435, 440 (D.D.C. 1991).

United States District Court
Northern District of California

same as affirmatively requiring that it be allowed. "It is quite wrong to view th[e] decision [not to adopt some regulation] as the functional equivalent of a regulation prohibiting all States and their political subdivisions from adopting such a regulation." *Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*, 537 U.S. 51, 65 (2002). On the contrary, "matters left unaddressed in such a [federal statutory regulation that is comprehensive and detailed] are presumably left subject to the disposition provided by state law." *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 85 (1994). Here, the plaintiffs have not alleged any facts demonstrating that Congress' decision not to prohibit the possession or trade of shark fin is one that Congress specifically rejected or would not have sanctioned, nor have they pointed to any support for that notion in the federal shark fin law or its legislative history. Federal law is not a floor or a ceiling such any state law varying from what federal law permits is preempted. *Wyeth*, 555 U.S. at 575. "At most," the defendants correctly concede, "the MSA confers limited discretion in some circumstances to limit the sale of catch through a [FMP]." Def.'s Reply 13 (citing 16 U.S.C. § 1853(b)(3)(B)). But as noted earlier, the plaintiffs have not alleged that the federal government implemented one relevant to the issues here. Without pleading evidence of Congress' intent to preempt state laws, preemption should not be presumed. *See Wyeth*, 555 U.S. at 565 n.3 (stating that the Supreme Court "has long held" "that the presumption against pre-emption should [ ] apply to claims of implied conflict pre-emption"); *but see id.* at 624 (Alito, J., dissenting). The plaintiffs have not sufficiently pleaded an impermissible conflict between the Shark Fin Law and the MSA.

The FAC pleads no facts showing a conflict between the Shark Fin Law and federal law. "A state law [ ] is pre-empted if it interferes with the methods by which the federal statute was designed to reach [its] goal." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987). Without making any allegations demonstrating how the Shark Fin Law hinders federal objectives or actually conflicts with federal law, the plaintiffs fail to state a claim that the law is preempted.

## V.  THE PLAINTIFFS FAIL TO STATE A CLAIM UNDER 42 U.S.C. § 1983.

Section 1983 of Title 42 of the United States Code provides a cause of action for anyone who suffers a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" under color of state law. Because the plaintiffs fail to adequately plead that the defendants

23

violated any of the plaintiffs' constitutional rights, they also fail to state a claim under Section 1983.

### CONCLUSION

The plaintiffs fail to adequately allege that the defendants violated any provision of the Constitution or deprived the plaintiffs of any constitutional right. At the hearing on the motions, I asked counsel for the plaintiffs whether there were any additional facts he could plead. He said there were none. Because additional pleading is likely to be futile, the motions to dismiss are GRANTED and the FAC is DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED.**

Dated: March 24, 2014

_____
WILLIAM H. ORRICK
United States District Judge

United States District Court
Northern District of California

24